UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **CLAUDIA BROTHERS**, et al., | ) | Case No. 5:03 CV 1002 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | MEMORANDUM OPINION |
| | ) | (Resolving Docket No. 38) |
| **COUNTY OF SUMMIT**, et al., | ) | |
| | ) | |
| Defendants. | ) | Magistrate Judge James S. Gallas |
| | ) | |

Mr. David Corsi and Ms. Claudia Brothers have sued the County of Summit, members of its

county council, its county executive, the Summit County Sheriff, Drew Alexander,  sheriff's

officials Linda Rinear, Larry Momchilov, Kelly Fatheree, in both their official and individual

capacities, John Does Nos. 1 through10, and "Websites Against Child Porn," under 42 U.S.C. §1983

for violations of Fourth Amendment protections, and raised state law based claims under this court's

supplemental jurisdiction of  violations of Article I Section 14 of the Constitution of the State of

Ohio, severe emotional distress, " malicious, false and defamatory statements to the media," and

"appropriation or exploitation of Plaintiffs' personalities." [1]  Plaintiffs' complaint arose from an

investigation commencing on March 18, 2002 by law enforcement officers of the Summit County

Sheriff's Department which led to Mr. Corsi being arrested on May 30, 2002, on felony charges of:

child endangering; illegal use of minor in nudity-oriented material; voyeurism;  misdemeanor

---

[1] Because the complaint has never been amended in order to provide the names of these unidentified individuals and entities, which have been only identified as John Does and websites, that portion of the complaint is stricken *sua sponte* by the court.  See *Petty v. County of Franklin, Ohio*, 478 F.3d 341, 345-46 (6th Cir. 2007); *Collins v. Internal Revenue Service*, 1996 WL 279180 (Table) 86 F.3d 1155 (6th Cir. May 23, 1996); *Ecclesiastical Order of the Ism of Am, Inc. v. Chasin*, 845 F.2d 113, 116 (6th Cir. 1988); *Harris v. City of Cleveland*, 190 F.R.D. 215, 217 (N.D. Ohio 1999). Plaintiffs have had adequate time to conduct discovery and to properly identify and serve the dismissed defendants. Accordingly, the case shall proceed only upon the identified defendants, who are movants in this matter.

offenses of endangering children, and disseminating material harmful to minors. Mr. Corsi was released on bond and a subsequent secret indictment was issued.  Law enforcement officers created a media stir, which plaintiffs claim damaged their reputation.  In response to the criminal charges, Mr. Corsi obtained counsel, who on October 29, 2002, moved to suppress evidence obtained by allegedly defective search warrants lacking probable cause.  On December 13, 2002 prior to the suppression hearing, the Summit County Prosecutor dismissed all charges.

The County of Summit,  its sheriff and the officials served with process of the complaint have moved for summary judgment.  Under Rule 56 of the Federal Rules of Civil Procedure granting a motion for summary judgment is only proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  In determining whether there is a genuine issue of material fact all inferences drawn from the underlying facts contained in affidavits, pleadings, responses to discovery requests, and depositions must be viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587-88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *United States v. Diebold, Inc.*, 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962).  A court must inquire "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  The court may not make credibility determinations or weigh the evidence when ruling on a motion for summary judgment. *Anderson*, 477 U.S. at 255.  The burden is upon the movant to demonstrate the absence of a genuine issue of material fact. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Smith v. Hudson*, 600 F.2d 60, 63 (6th Cir. 1979), *cert. dismissed* 444 U.S. 986 (1979).  However, the nonmoving party is

obliged to produce some evidence other than mere pleadings themselves to demonstrate that there is a genuine issue for trial.  *Celotex Corporation v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  The nonmoving party must produce significant probative evidence in support of the complaint to defeat the motion for summary judgment through affidavits or admissions on file.  *Moore v. Phillip Morris Cos., Inc.*, 8 F.3d 335, 339-40 (6th Cir. 1993).  In the final analysis, "the threshold inquiry . . . [is] whether there is a need for trial -- whether in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  *Anderson*, 477 U.S. at 250; *Moore*, 8 F.3d at 340. Once the nonmoving party has responded , the court must view the facts in the light most favorable to the nonmoving party. *Darrah v. City of Oak Park,* 255 F.3d 301, 304 n.1 (6th Cir. 2001).

*The Investigation Commences:*

Plaintiffs David Corsi and Claudia Brothers operated KD Daycare in Northfield Center, Ohio.  The business belonged to Mr. Corsi with Ms. Brothers serving as administrator.  On or about March 18, 2002, the Summit County Sheriff's Department received a call from Captain Jeff Buck of the Reminderville Police Department.  Captain Buck advised Sheriff's Department Detective Linda Rinear that a parent had called and reported that the owners of the KD Day Care were taking children into a private room alone.  Capt. Buck asked the Sheriff's Department to follow up on the call.  Detective Rinear began an investigation of Mr. Corsi and KD Day Care Center and became the lead investigator on the case.  She had received training regarding the abuse and exploitation of children.       Detective Rinear spoke with Jean Hollan-Vincer, from the Ohio Department of Job and Family Services, who had regulatory oversight of daycares in the region, to determine what

5:03 CV 1002                                        4

types of complaints they had received regarding the operation of the daycare.  She provided Detective Rinear with a list of prior complaints with their resolutions since Mr. Corsi and Ms. Brothers had taken over running the daycare in 1996.  Among these complaints was one from October 2000 that Mr. Corsi was sleeping at the daycare overnight and showering there.  Ms. Hollan-Vincer stated that she spoke with Mr. Corsi about this complaint and about why there was a bed in the daycare, and his response was that he occasionally stayed overnight at the center necessitating the bed.  Ms. Hollan-Vincer further advised Mr. Corsi that it was not a good idea to have a bed in the daycare, nor was it a good idea to be alone with the children in the room where the bed existed.  Ms. Hollan-Vincer also told Detective Rinear that Ms. Brothers stated that she was a retired Canton school teacher and that Mr. Corsi had claimed to be a retired executive from Timken Co.  Inspector Keith Thornton of the Summit County Sheriff's Department followed up on this past employment information and determined Mr. Corsi was a retired furnace worker at Timken Co., not an executive, and that Ms. Brothers was not a retired teacher from the Canton Schools.  Defendants now concede, though, that Ms. Brothers was a retired Canton City School teacher.

Detective Rinear then made a call to a complaining parent.  The parent said that she was uncomfortable with the owners taking her child into a private room.  She also gave Detective Rinear the name of two daycare employees.

Detective Rinear then contacted and met with KD Day Care employee Latasha Thomas, who stated that Mr. Corsi did take children into the private room both in groups and individually.  The door remained shut while the children were in the room. She believed that Mr. Corsi was teaching the children gambling and shooting guns. Marvianne Barett, another employee of the daycare, corroborated that this was occurring. During their interviews Ms. Thomas and Ms. Barett

5:03 CV 1002                                    5

volunteered the names of several children who had been alone with Mr. Corsi.  These names included C.M. and M.Z.    After obtaining parental consent, Detective Rinear accompanied by Detective Rogers  interviewed C.M. and M.Z. — both of whom were in the third grade.

As related in Detective Rinear's affidavit for search warrant that was obtained following these interviews,  C.M. related to Detectives Rinear and Rodgers the following events referring to Mr. Corsi as Mr. Dave, and Ms. Brothers as Ms. Claudia:

> C.M. told Affiant that Mr. Dave has sleepovers at the Daycare Center three times a year.  One was at Halloween last year.  [C.M.] told Affiant that the boys try to scare the girls.  They decorate the daycare center and hide cameras in the ceiling and record the girls.
>
> He is in a secret club, which Mr. Dave [Corsi] is in charge of.  Only a few boys are allowed to be in the club. [C.M.] stated to Affiant that when they are in the club Mr. Dave gives them nicknames, his is "[deleted to protect identity]."  Mr. Dave lets them come to his private room where they get to play with a play station, watch scary movies, eat candy, and sit on a bed that vibrates. [C.M.] stated to Affiant that to get candy and extra privileges, the boys in the club have to do a lot of work for Mr. Dave.  Mr. Dave tells them to chase the girls and when they catch them they have to hit them. [C.M.] states Mr. Dave says that is how they show that they like the girls.
>
> [C.M.] stated to Affiant that in Mr. Dave's private room there is a bed that vibrates and has drawers underneath it.  In the drawers Mr. Dave keeps a video camera that Mr. Dave had [C.M.] use (sic) to go up into a crawl space in the ceiling and video tape the girls in the bathroom changing clothes.  The videos are viewed by the boys in the secret club, and kept in a drawer under the bed.  Mr. Dave has quarters to make the bed vibrate. [C.M.] sits in the middle of the bed and Mr. Dave sits on the bed with him and makes the bed vibrate. [C.M.] states Mr. Dave shakes a lot and has never fallen out of the bed. [C.M.] states that Mr. Dave sleeps in the private room and the internet is available on the computer.
>
> [C.M.] stated to Affiant there is a television, a pool, toys, and a secret door in the ceiling with a string that pulls the door open and ladder down to get to the crawl space. [C.M.] stated to Affiant the last time he [sic] Mr. Dave had him videotape the girls was last year around Easter. [C.M.] stated he asked Mr. Dave four weeks ago where the camera and the videotapes were and Mr.

5:03 CV 1002                                    6

Dave told him they were still in the drawer under the bed. [C.M.] stated to Affiant that he has taken tapes to Mr. Dave's car and put them on the back seat and Mr. Dave said he was taking the tapes home. [C.M.] stated to Affiant Ms. Claudia gets mad at Mr. Dave when he takes pictures of the children.

[C.M.] stated to Affiant Mr. Dave has told him that he is not allowed to tell anyone about the secret club or [sic] they do together or he will not be allowed to be in the club anymore. [C.M.] states that he is not permitted to enter the private room when Mr. Dave is in the room with another boy. [C.M.] states that if any one enters the room when someone else is there with Mr. Dave they will be kicked out of the club for good, period.

[C.M.] told Affiant he knows what his private areas of his body are. [C.M.] calls his penis "pickle" and stated that Mr. Dave told this name.  He states that Mr. Dave calls a girl's private area hamburger. [C.M.] states the boy in the club and Mr. Dave talks a lot about girls. [C.M.] states he called his buttocks "butt," and that he has no other private parts.  He knows a good touch from a bad touch.  No one has ever touched his "pickle," he has not been asked to touch anyone else's "pickle."  No one has told him to touch a girl's "hamburger."  Mr. Dave tells them they can chase the girls and kiss them.  Mr. Dave has boys fight with girls and the boys have to win or they can't be in the club. [C.M.] drew a picture of the private room for Affiant and labeled items drawn in the room.(Det. Rinear Aff. ¶7, Ex. A-1, Docket No. 38).

C.M.'s participation in these events was allegedly through Easter of 2001.

In Detective Rinear's interview of the other child, M.Z. he stated that at the daycare he is in a secret club and that Mr. Dave was in charge of the club; that Mr. Dave was also in charge of the girls club; that he has never told a secret; that the private room has a couch, toys, TV, and bed that folds up into a couch; that he watched movies like Robin Hood with Kevin Costner, and that Mr. Dave takes pictures of him and the other children. Following these interviews Detective Rinear met with Prosecutor Dwayne Jones and discussed the case.  It was decided that the only way to determine whether anything was going on was to conduct a search.  Detective Rinear prepared an

5:03 CV 1002                                     7

affidavit outlining her entire investigation and providing all of the information that she had received during said investigation.  The affidavit was presented to Cuyahoga Falls Municipal Judge Linda Teodosio and a search warrant was issued for a daytime search of the daycare center.

Prior to conducting the search, Detective Rinear requested Detective Kelly Fatheree to take a walk through of the daycare to obtain the daycare's layout.  Detective Fatheree took a 6-year old female child with her and posing as a prospective customer, she was given a tour by Ms. Brothers. Detective Fatheree provided a summary of the layout of the center to Capt. Larry Limbert and Detective Rinear before they executed the search warrant.  Detective Fatheree, as related in Detective Rinear's search warrant affidavit, stated that "across from the toddler room is a door with the words 'private Eye' and a round peephole.  Detective Fatheree was not permitted to see inside this room."  (Det. Rinear Aff. ¶9, Ex. A-1).


*The First Search*

Sheriff's officers appeared at the daycare on May 23, 2002 around 3:40 p.m., and presented the warrant to Ms. Brothers upon their arrival.  Detective Rinear did not participate in the actual search. Each room at the daycare was searched with the primary focus on the office and the private rooms described by the children.  As instructed Ms. Brothers unlocked the offices and staff bathroom.  In the larger office (which has the word "Private Eye" circumscribing a peephole) they found a futon, a TV, a box of various videotapes (including PG13 and PG movies), and computer discs.  The staff bathroom attached to the "private eye" office was searched and a 9 mm. Jennings handgun with a loaded magazine was found in a drawer along with a 12" inch knife with a sheath, and a Sports Illustrated swimsuit calendar.

5:03 CV 1002                                    8

Using a ladder propped against a wall in the staff bathroom Sheriff's detectives pushed the drop ceiling tiles aside, and found a 6-8 foot space above the ceiling and below the roof of the building. In the drywall composed firewall that separated the staff bathroom from another bathroom, a square piece had been cut out and taped back in place.  There were what appeared to be fingerprints on the ceiling above this piece in the wall.  The officers looked through the cutout spot and saw that they were looking at the ceiling of the adjoining bathroom.

In a separate private office (the "front office") were found a yellow VHS video camera in a plastic bag.  While the camera was being catalogued into evidence the detective's face appeared on the television screen in the separate private office where a detective  was working.  The detectives had noticed that each bathroom had ceiling tiles with holes in the corners.  The wireless camera lens fit perfectly into these holes with the lens pointing toward the toilet area of the bathroom.  The detectives also found pictures of naked women that had been downloaded from the internet in the separate "private eye" office.  There was another swimsuit type calendar in this office as well in plain sight with scantily clad women on it. They also recovered another video camera, VHS videotapes, video cassette recorder,  two cut pieces of drywall from the bathroom, a Polaroid camera, a film projector, a micro tape recorder, and computer discs. (Search Warrant Return, Defs.' Ex. A-3)  Finding that the computer had likely been used to access pornography off of the internet, the decision was made to seize the computer hard drives, as well as items that could have been used in videos with the children - black bullwhip, and yellow plastic foam hammer.

The items seized were taken back to the Sheriff's Department.  Stan Smith, a forensic investigator with the Akron Police Department inspected the hard drive of the computer and found

5:03 CV 1002                                        9

hundreds of images of naked women.  Officer Smith gave these images to Detective Rinear and the

Detective Bureau for use in any potential case against Mr. Corsi.

While at KD Day Care, Mr. Corsi removed dropped ceiling panels to show Detective Rinear

that the holes were due to water damage.  He related that the building's owner had placed hoses and

funnels to catch roof leakage to run to the bathroom sinks.  Both Dets. Rogers and Rinear observed

the water marks on the ceiling tiles and the funnel with hoses poking through the ceiling tiles.

Ms. Brothers adds that after she unlocked the doors to allow the detectives to gain access to

the office, and the "private eye" office and the staff restroom within the "private eye" office she

waived her right to silence  and was asked about Mr. Corsi taking pictures.  Ms. Brothers responded

that she and staff members had recently obtained a video camera that Mr. Corsi had tested with the

children playing musical chairs.  She was also asked about an incident about a child being hosed

down naked and she related the incident had occurred following an incident of diarrhea.

Mr. Corsi also claims that he was interrogated and explained that he had cut a square from

the drywall fiberboard above the staff bathroom to run a television cable and he explained that he

kept the weapons at the KD Day Care Center for protection when he spent the nights there because

he lived over 50 miles away.

*Mr. Corsi's Arrest*:

Following the search of KD Day Care,  Detective Rinear filed complaints sworn before a

deputy clerk of the Cuyahoga Falls Municipal Court charging Mr. Corsi with the following felonies

of:

5:03 CV 1002                                          10

1.      Child endangering between January 1, 2001 and May 31, 2001 in
        violation of Ohio Rev. Code §2919.22(B)(5) involving a juvenile
        under the age of 18 in a sexually oriented manner or nudity oriented
        matter.

2.      Disseminating material harmful to juveniles on May 23, 2002 in
        violation of §2907.31(A)(3) involving a juvenile being allowed to
        review or peruse any material or live performance that is harmful to
        juveniles.

3.      Voyeurism between January 1 and May 31, 2001 in violation of
        § 2907.08(D)(5) involving surreptitious invasion of privacy of minor
        children at the KD Day Care Center, to photograph minor children in
        a state of nudity for the purpose of sexual arousal or gratification,
        when the caregiver is serving in a child daycare center.

Detective Rinear also filed a complaint for a misdemeanor offense against Mr. Corsi of
endangering children on May 23, 2003, by creating a substantial risk to health or safety.  She related
in her incident report dated May 22, 2002 that, "[C.M.] states David Corsi had him videotape girls
changing in the bathroom at KD Day Care through a hole in the ceiling.  He further states that Mr.
Corsi permitted other boys in the daycare to view the tapes."  (Defendants' Ex. 5, Docket No. 38).
Mr. Corsi was arrested on May 29, or May 30, 2002 and appeared in court and was released on
$100,000 personal recognizance bond.

*Press Release*:

On May 29, 2002 the Sheriff's Department issued a press release announcing Mr. Corsi's
arrest on two counts of child endangering, one count of disseminating matter harmful to children and
one count of voyeurism.  The press release identified him as the president and co-owner of KD Day

5:03 CV 1002                                    11

Care Center and gave the center's address.  Some details of the May 23 search were disclosed including the seizure of "a loaded 9 mm. pistol, a 12" Bowie knife, a leather bullwhip, two video cameras, a computer, various videotapes, a television monitor, a Polaroid camera and photos depicting nudity."  The investigation was reported as continuing and the release asked that inquiries from parents and employees be directed to the Summit County Sheriff's Office Detective Bureau.

*The Second Search:*

Detective Rinear also wanted to search Mr. Corsi's home in Malvern, Carroll County, Ohio.  Detective Rinear contacted a part-time judge from Carroll County to discuss obtaining a search warrant of Mr. Corsi's residence.  She had wanted to conduct the searches simultaneously with the daycare search, but the Carroll County Judge advised her that the judges there would probably not permit a  simultaneous search and would grant a search warrant depending on what was found in the search of the daycare.

On May 31, 2002 Detective Rinear appeared before Judge Charles A. Johnston of the Carroll County Court, who was not the same part-time judge she had spoken to previously.  Her affidavit was essentially the same as her affidavit from the first search including the statements attributed to C.M.  Detective Rinear though had updated the affidavit with the following paragraphs that included the items seized from the May 23, 2002 search of KD Day Care:

> On May 23, 2002, the Summit County Sheriff's Office executed a court ordered search warrant at the K-D Day Care Center and Preschool located at 105 E. Aurora Road, Northfield Center Township, County of Summit, State of Ohio.  The items seized included a loaded semi-auto pistol, bowie knife, bullwip, wireless camera, Monitor and recording device, and photographs, which depict females, dressed in various bathing suits.

5:03 CV 1002                                        12

(Det. Rinear, Aff. ¶14, Ex. A-6, Docket No. 38).

The affidavit also mentioned the recent arrest of Mr. Corsi and the charges; and Detective

Rinear concluded in her affidavit that in her experience  other items would be found in Mr. Corsi's

home.

The warrant was issued by the court and many items were seized from Mr. Corsi's home

including the computer, personal organizer, "floppy" disc, photographs and magazines, "papers,"

videotapes, films, cameras and a calendar.  Nothing incriminating was uncovered.


*Indictment by Grand Jury:*

Detective Rinear states in her affidavit that this case was presented to the grand jury who

issued a secret indictment and the case proceeded through the criminal process (Affidavit, Exhibit

A, ¶65, Docket No. 38).  Subsequently the case began to unravel when one juvenile witness claimed

that he could not remember, and a parent of another child stated that he made up the story and would

not testify.  *Id.* at ¶66.  The Summit County Prosecutor decided to dismiss the charges.  All items

seized were returned except a Jennings 9 mm. handgun seized from KD Day Care Center which was

destroyed with Mr. Corsi's consent (See Voluntary Property Surrender, Defendant's Ex. A-11).


Plaintiffs' claim in the complaint under the first count, that defendants' actions were in clear

violation of the Fourth Amendment of the U.S. Constitution and Article I, Section 14 of the Ohio

Constitution.  In the second count, defendants are accused of causing severe emotional distress in

violation of state law.  In the third count, defendants are accused of causing Mr. Corsi's false arrest

in violation of federal and state constitutional provisions.  In the fourth count, defendants are alleged

5:03 CV 1002                                          13

to have caused Mr. Corsi's false imprisonment in violation of constitutional provisions.  In the fifth count, defendants are accused of making malicious, false and defamatory statements to the media, published without privilege.  In the sixth count, defendants' "bad acts" allegedly resulted in appropriation or exploitation of Ms. Brothers and Mr. Corsi's personalities and publication of their private affairs due to defendants' invasion of their privacy.

### *Federal Claims*:

Plaintiffs' federal claims are brought under 42 U.S.C. §1983 which, ". . . merely provides a mechanism for enforcing individual rights 'secured' elsewhere, i.e. rights independently 'secured by the Constitution and laws' of the United States.   For §1983 by itself does not protect anyone against anything.'" *Gonzaga Univ. v. Doe*, 536 U.S. 273, 285, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002), quoting *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 617, 99 S.Ct. 1906, 60 L.Ed.2d 508 (1979). Section1983 "merely provides remedies for deprivations of rights established elsewhere."  *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 301 (6th Cir. 2005).

Plaintiffs claim in their first, third and fourth causes of action that defendants violated their Fourth Amendment rights.  The Fourth Amendment of the U.S. Constitution secures, "[t]he right of the people to be secure in their persons, houses, papers, effects, against unreasonable searches and seizures..." Constitutional protections are made applicable to the states through the Fourteenth Amendment and apply with equal force in both civil and criminal contexts.  See *Camara v. Mun. Court of San Francisco*, 387 U.S. 523, 539, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967); *Thomas v. Cohen*, 304 F.3d 563, 569 (6th Cir. 2002), *cert. denied*, 538 U.S. 1032 (2003).

5:03 CV 1002                            14

*County of Summit and Defendants in their Official Capacities:*

Plaintiffs contend that the County of Summit, and its executive, council members, the Sheriff and his officers, in their official capacities, violated plaintiffs' rights under the Fourth Amendment for procuring search warrants without probable cause resulting in the arrest and imprisonment of Mr. Corsi without probable cause, and in his humiliation. [2] With respect to the individual defendants named in their official capacities, this action is equivalent to a suit against the county itself.  See *Kentucky v. Graham*, 473 U.S. 159, 166, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985); *Johnson v. Karnes*, 868 F.3d 877 (6th Cir. 2005), 398 F.3d at 877; *Knott v. Sullivan*, 418 F.3d 561, 574-75 (6th Cir. 2005); *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

County government has long been considered to be a form of local government equivalent to municipal government.  See *Lincoln Cty. v. Luning*, 133 U.S. 529, 530, 10 S.Ct. 363, 33 L.Ed. 766 (1890).  The idea that a county was a "person" under 42 U.S.C. §1983 flowed implicitly from *Monell's* holding that a municipality was a "person" for purposes of §1983 and that Congress intended §1983 to apply to municipalities and "other local government units." [3]  See *Monell,* 436 U.S. at 691; *Bd. of Cty. Com'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403, 117 S. Ct. 1382, 137 L.Ed.2d 626 (1997).

---

[2] Plaintiffs correctly did not name the sheriff's department as a defendant entity.  The sheriff's department is not a "person" for purposes of §1983.  See *Petty*, 478 F.3d at 347; *Batchisk v. Summit Cty. Sheriff's Dept.*, 1989 WL 26084 at *1 (Ohio Ct. App. Mar. 15, 1989) (sheriff, not sheriff's department was entity capable of being sued).

[3] To prevail under §1983, plaintiffs must establish that a "person" acting under color of state law deprived them of this right secured by the Constitution.  See *Radvansky*, 395 F.3d at 302; and see *Inyo Cty, Cal. v. Paiute-Shoshone Indians . . .*, 538 U.S. 701, 708, 123 S.Ct. 1887, 155 L.Ed.2d 933 (2003) ("[§1983] permits 'citizen[s]' and 'other person[s] within the jurisdiction of the United States to seek legal and equitable relief from 'person[s]' who, under color of state law, deprive them of federally protected rights.")

5:03 CV 1002                                    15

There is no vicarious liability under *respondeat superior* against a government entity for the acts of its employees. *Collins v. City of Harker Heights, Texas,* 503 U.S. 115, 120, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992); and see *Bd. of Cty. Com'rs of Bryan Cty.*, 520 U.S. at 405-09; *Polk Cty. v. Dodson*, 454 U.S. 312, 325-26, 201 S.Ct. 445, 453-54, 70 L.Ed.2d 509 (1981); *Canton v. Harris*, 489 U.S. 378, 392, 109 S.Ct. 1997, 103 L.Ed.2d 412 (1989). "[A] municipality cannot be held liable solely because it employs a tort-feasor." *Monell*, 436 U.S. at 691, 98 S.Ct. at 2036; *Alioto v. City of Shively, Ky.*, 835 F.2d 1173, 1175 (6th Cir. 1987). Congress did not intend a municipality to be liable for its employees' discretionary action unless it was the product of official municipal policy, as established by custom or policy, including a policy of deliberate indifference.  See *Collins v. City of Harker Heights, Texas,* 503 U.S. 115, 118, 112 S.Ct. 1061, 1065; 117 L.Ed.2d 261 (1992); *Monell*, 436 U.S. at 691, 98 S.Ct. at 2036; *Pembaur v. City of Cincinnati*, 475 U.S. 469, 477, 106 S.Ct. 1292, 1297, 89 L.Ed.2d 452 (1986); *City of Canton v. Harris*, 489 U.S. 378, 388-89, 109 S.Ct. 1197, 1204-05, 103 L.Ed.2d 412 (1989).  The government employee's "discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of discretion."  *Pembauer*, 475 U.S. at 481-482; *Miller*, 408 F.3d at 814. "The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged.  That is, a plaintiffs must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights"  *Board of County Com'rs*, 520 U.S. at 404, 117 S.Ct. at 1388.

Plaintiffs must show that the county executive and council members participated in the decisions in issues in some manner, or implicitly authorized, approved or knowingly acquiesced in unconstitutional conduct.  *Knott*, 418 F.3d at 574; *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir.),

5:03 CV 1002                                      16

*cert. denied*, 469 U.S. 845 (1984). Because liability cannot be based on *respondeat superior* liability, plaintiffs' failure to demonstrate policy or custom requires dismissal of the county executive and council members sued in their official capacities. See *Johnson*, 398 F.3d at 877-78; *Petty*, 478 F.3d at 347-48.

With respect to the sheriff and law enforcement officers, plaintiffs contend that the alleged deprivations were the result of "custom," particularly the "custom"of the Sheriff's Department's "reputation" for abuse of the Fourth Amendment, and that commensurate with that reputation, search warrants were issued without probable cause and criminal charges were issued without probable cause. Plaintiffs incorporate their allegations from their complaint that the Summit County Sheriff's Department has a "reputation" for abuse of the Fourth Amendment (Complaint ¶37), that the search warrants were illegal and issued without probable cause (Complaint ¶39), and criminal charges proceeded against plaintiff Mr. Corsi without probable cause and with no evidence in support of conviction (Complaint ¶39). Plaintiffs contend based on these alleged "customary" violations that Mr. Corsi was arrested, jailed and humiliated before the public.

There is no factual or legal foundation for this argument. Granted, "an act performed pursuant to a 'custom' that has *not* been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on a theory that the relevant practice is so widespread as to have the force of law (emphasis supplied)." *Board of County Com'rs*, 520 U.S. at 404, 117 S.Ct. at 1388; *Monell*, 436 U.S. at 690-91, 98 S.Ct. at 2035-2036. Plaintiffs' bare assertion, however, fails to show widespread departmental tolerance for Fourth Amendment violations. See *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005); *Doe v. Claibourne Cty.*, 103 F.3d 495, 507 (6th

5:03 CV 1002                                            17

Cir. 1996). [4]  An isolated incident does not establish an official municipal policy.  *Board of County Com'rs*, 520 U.S. at 405, 117 S.Ct. at 1389; *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 824, 105 S.Ct. 2422, 2436, 85 Ed.2d 791 (1985).

Essentially plaintiffs allege a lack of corrective response from supervisory personnel. The Sixth Circuit has articulated the requirements for a claim on the basis of an "inaction theory" where an unwritten custom of tolerating federal rights violations is entrenched. See *Doe v. Claiborne County*, 103 F.3d 495, 507-08 (6th Cir. 1996)*; Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005), *cert. denied*, 126 S.Ct. 338, 163 L.Ed.2d 50 (2005).  Plaintiffs must show:

> (1) the existence of a clear and persistent pattern of [illegal activity];
>
> (2) notice or constructive notice on the part of the [defendant];
>
> (3) the [defendant's] tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and
>
> (4) that the [defendant's] custom was the "moving force" or direct causal link in the constitutional deprivation.
>
> *Thomas*, 398 F.3d at 429; *Doe*, 103 F.3d at 508; and see *City of Canton*, 489 U.S. at 388-89; *Pembaur v. City of Cincinnati*, 475 U.S. at 480.

Plaintiffs rely on the deposition testimony from Detective Rinear and Inspector Thornton which they claim exhibits bias toward finding inculpatory information and downplaying exculpatory evidence.  Plaintiffs find Detective Rinear's statement, "Just because . . . you don't find something doesn't mean that it didn't happen." ( Det. Rinear Dep. at 140) to be abhorrent as well as Inspector

---

[4] There are at least four avenues a plaintiff may take to prove the existence of a municipality's illegal policy or custom.  The plaintiff can look to (1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations.  *Thomas*, 398 F.3d at 429, citing *Monell*, 436 U.S. at 694.

5:03 CV 1002                                      18

Thornton's view that incriminating items "could be there one day and not there another day." (Thurton Dep. at 73).  These statements are intended as evidence of custom or policy to obtain search warrants without probable cause.

Plaintiffs fail to produce evidence of a clear and persistent pattern other than their bare statement of "reputation."  They have not put forth evidence of previous complaints.  Plaintiffs have shown no custom or policy of seeking criminal charges without probable cause.  They have shown no custom or policy of humiliating Mr. Corsi.

Plaintiffs appear to be arguing that there was notice on the part of the county due to statements from defendant Larry Momchilov, whom plaintiffs claim was Detective Rinear's supervisor, that there was no probable cause to search Mr Corsi's residence in Carroll County. [5]  In plaintiffs' version of events Detective Rinear apparently overrode the authority of her supervisors followed by their acquiescence since no effort was made by the county to quash the search warrant process once instigated by Detective Rinear.  While this construction of events arguably shows notice and tacit approval (steps 2 and 3 from *Doe* and *Thomas*), it  fails to show a clear and persistent pattern or that there was a custom or policy that had a direct causal link to the second

---

[5] The transcribed text, to which defendants express no objection reads:

> Larry: Yes he could.  See our problem is that we went there with a search warrant and we confiscated everything out of there.  We don't know if he, let's say is not involved in any of the kiddy porn.

> Geri: Yea.

> Larry: You know then that is fine.  But if he is involved in kiddy porn, if you want to call it that, then he has taken it out of there and taken it some place else.  We did not have enough evidence to go to his residence in Carroll County to do a search of his residence.  If we had just a trace, we would did a search warrant to go down there and search his residence, we didn't have it so we couldn't go there.

(Plaintiffs' Ex. 3A, pg. 4).

5:03 CV 1002                                         19

search.  Accordingly, plaintiffs, under their "reputation" theory have established no "custom" or

policy on which to hold the  the County of Summit, liable for the actions of its employees.


*Federal Claims - Individual Capacity:*

Government officials may be "held liable in their personal capacity for actions they take in

their official capacity."*Hafer v. Melo.* 502 U.S. 21, 27,  112 S. Ct. 358, 116 L.Ed. 2d 301 (1991);

*Mitchell v. Chapman*, 343 F.3d 811, 832 (6th Cir. 2003). Defendants as sued in their personal or

individual capacity contend that are shielded from plaintiffs' claim of Fourth Amendment violations

of their civil rights due to qualified immunity. Qualified immunity protects government officials

from individual liability due to performance of discretionary functions unless plaintiff asserts the

official violated a "clearly established statutory or constitutional rights of which a reasonable person

would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d

396 (1982); *Knott*, 418 F.3d at 571.


In this circuit, a three step approach has emerged for evaluating the affirmative defense of

qualified immunity.  See *Haynes v. City of Circleville, Ohio*, 474 F.3d 357, 362 (6th Cir. 2007);

*Perez v. Oakland Cty.*, 466 F.3d 416, 436 (J. Moore concurring/dissenting 6th Cir. 2006); *Sample

v. Bailey*, 409 F.3d 689, 696 n. 3 (6th Cir. 2005); *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir.

2003).  First, the court considers whether the evidence in light most favorable to the plaintiff

shows a constitutional right has been violated.  If no constitutional or statutory rights have been

violated then that official must be dismissed at this threshold step obviously became no civil

rights violation has occurred.  *St. John v. Hickey*, 411 F.3d 762, 768 (6th Cir. 2005); *Saucier v.*

*Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Second, the court considers, if a violation has been demonstrated, whether the right was clearly established.  *Haynes,* 474 F.3d at 362.  The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.  *Sample v. Bailey*, 409 F.3d 689, 698 (6th Cir. 2005), quoting *Saucier v. Katz*, 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); *Knott*, 418 F.3d at 571.  The third step is "whether the plaintiff offered sufficient evidence to indicate that what the official did was objectively unreasonable in light of clearly established constitutional rights."  *Haynes*, 474 F.3d at 362; *Swiecicki v. Delgado*, 463 F.3d 489, 498 (6th Cir. 2006).  "[I]f the right is clearly established, the conduct at issue would also be objectively unreasonable,"  the second and third steps would be collapsed, "in an effort to avoid duplicative analysis."  *Haynes*, 474 F.3d at 362; *Swiecicki*, 463 F.3d at 498.  The burden is on the plaintiff to demonstrate that the official is not entitled to qualified immunity.  *Haynes*, 474 F.3d at 362; *Painter v. Robertson*, 185 F.3d 557, 567 (6th Cir. 1999).

*Sheriff Drew Alexander*:

Sheriff Drew Alexander contends he was not involved in the criminal prosecution, did not enter the daycare center or Mr. Corsi's home, and committed no act against plaintiffs. Plaintiffs allege that the Sheriff is liable because he has the right of control.[6]  Just as the county could not be held liable for the actions of its employees under *respondeat superior*, a

---

[6] Plaintiffs' Exhibit No. 5 is listed as a May 29, 2002 press release by Summit County Sheriff Drew Alexander. Although this press release purports to be an announcement for the sheriff, it concludes by requesting all media inquiries to Inspector Keith W. Thornton.  Plaintiffs do not attempt to attribute this press release to the sheriff himself, so there is no argument that the sheriff is personally responsible for the plaintiff's allegations of humiliation and defamation.

government supervisory employee, like a county sheriff, cannot be held liable when sued in an individual or personal capacity for the actions of employees over whom there was supervisory authority. See *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999); *Leary v. Daeschner*, 349 F.3d 888, 903 (6th Cir. 2003); *Dunn v. Tennessee*, 697 F.2d.121, 128 (6th Cir.1982), *cert. denied*, 460 U.S. 1060 (1983). Liability for supervision exists under §1983 only when "the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it," or "at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Leary,* at 903, quoting *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir.), *cert. denied*, 469 U.S. 845 (1984); and see *Jones v. Reynolds*, 438 F.3d 685, 689-90 (6th Cir. 2006); *Miller v. Calhoun County*, 408 F.3d 803, 817 n. 3 (6th Cir. 2005)("Because §1983 liability cannot be imposed under theory of *respondeat superior*, proof of personal involvement is required for the supervisor to incur personal liability."). Plaintiffs have not shown that Sheriff Alexander violated plaintiff's constitutional rights, and summary judgment will be entered in the sheriff's favor.

*Summit County Executive and Council Members*:

The complaint did not specify the capacity the county executive and council members were sued, but defendants assert the defense of qualified immunity with respect to all claims. Accordingly, since this defense only applies in matters where suit has been brought under individual capacity, it must be presumed that defendants interpret the complaint as raising individual capacity claims against these county officials. See *Moore v. City of Harriman*, 272 F.3d 769, 772 (6th Cir 2001); *Abdur-Rahman v. Michigan Dept. of Corrections*, 65 F.3d 489, 491

5:03 CV 1002                                        22

(6th Cir. 1995). Plaintiffs assertion of liability is premised on *respondeat superior*. Again, plaintiffs must show personal involvement by at least encouraging, implicitly authorizing or approving the activities or knowingly acquiescing in unconstitutional conduct of subordinates. See *Bellamy v. Bridley*, 729 F.2d at 421; *Miller v. Calhoun County*, 408 F.3d at 817 n. 3; *Knott v. Sullivan*, 418 F.3d at 574 (County Commissioner had no involvement in invalid search warrants executed by sheriff's deputies). Consequently, summary judgment dismissing the Summit County executive and council members is appropriate in their personal capacities since plaintiffs have come forward with no evidence of personal involvement.

*Detective Kelly Fatheree:*

Detective Fatheree did not sign affidavit or charges and did not participate in Mr. Corsi's arrest. Detective Rinear had asked Detective Fatheree to take a walk through the KD Day Care to provide information on its layout prior to executing a search warrant. On May 22, 2002 Detective Fatheree took a young girl with her posing as a prospective customer and requested a tour of the facility. Plaintiff Ms. Brothers showed Detective Fatheree around the facility. Following her tour she provided a layout of the facility to Detective Rinear and Sergeant Larry Limbert. Detective Linear and Sergeant Limbert later took part in the search of the facility on May 23, 2002.

It is well-established under both the Fourth Amendment and the state constitution that an undercover law enforcement officer may use ruse to gain consent to conduct a warrantless search of home or office. See *Maryland v. Macon*, 472 U.S. 463, 469, 105 S.Ct. 2778, 2782, 86 L.Ed.2d. 370 (1985); *Lewis v. U.S.*, 385 U.S. 206, 210-11, 87 S.Ct. 424, 427, 17 L.Ed.2d 312

5:03 CV 1002                                    23

(1965); *U.S. v. Pollard*, 215 F.3d 643, 648 (6th Cir. 2000), *cert. denied*, 531 U.S. 999 (2000);

*U.S. v. Baldwin*, 621 F.2d 251, 252-53 (6th Cir. 1980); *State v. Posey*, 40 Ohio St.3d 420, 534

N.E.2d 61 (1988).  "What a person normally exposes to the public . . . is not a subject of Fourth

Amendment Protection."  *Katz v. U.S.*, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576

(1976).  Consequently, "[a] government agent, in the same manner as a private person, may

accept an invitation to do business and may enter upon the premises for the very purposes

contemplated by the occupant."  *Lewis*, 385 U.S. at 211, 87 S.Ct. at 427; *Maryland*, 472 U.S. at

470, 105 S.Ct. at 2782.  Accordingly, there was no violation of any right under the Fourth

Amendment by Detective Fatheree's conduct.

### *Captain Larry Momchilov*:

Defendants state that Captain Larry Momchilov supervised the search of Mr. Corsi's

home in Malvern, Carroll County, Ohio on a warrant issued by Judge Johnson in the Carroll

County Court.  Captain Momchilov did not participate in obtaining the warrant or in Mr. Corsi's

arrest.  Plaintiffs do not contest these facts and have not overcome the legal principle that "an

officer may 'rely on a judicially secured warrant for immunity from an action for illegal search

and seizure unless the warrant is so lacking in indicia of probable cause, that official belief in the

existence of probable cause is unreasonable."  *Sinick v. County of Summit*, 76 Fed. Appx. 675,

680 (6th Cir. Sep. 24, 2003), quoting *Yancey v. Carroll Ct.*, 876 F.2d 1238, 1243 (6th Cir. 1989),

citing *Malley v. Briggs*, 475 U.S. 335, 344, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

Plaintiffs point out that Captain Momchilov had stated that there was a lack of probable

cause to search Mr. Corsi's home (See footnote 5, Plaintiffs' Ex. 3A, pg. 4). Defendants argue

5:03 CV 1002                                        24

that these statements were made in context of explanation of why the home and daycare could

not be searched simultaneously and prior to opportunity for complete review of the seizure

inventory from the daycare.  (Defs.' Reply pg. 2, Docket No. 64).  Defendants' unsworn

explanation cannot be accepted, but  it is unnecessary.

        Plaintiffs make the groundless leap from these statements to the conclusion that

somehow Detective Rinear was missupervised and misguided by Captain Momchilov in

submitting an application for search which omitted material facts and was made in reckless

disregard for truth, and Captain Momchilov knew this and permitted Detective Rinear to

proceed.  Defendants concede that Captain Momchilov at least was aware of Detective Rinear's

undertaking to secure a search warrant for the search of Mr. Corsi's home. Plaintiffs do not

allege, however, that the captain had additional knowledge not possessed by Detective Rinear of

any discrediting facts or information. Whether or not he had reservations, under these

circumstances, presents a claim derivative to that against Detective Rinear. Plaintiffs have at best

shown only that Captain Momchilov had subjective reservations without showing that the

affidavit for the search warrant was objectively so lacking in indicia of probable cause, that

official belief in the existence of probable cause was unreasonable.

        Plaintiffs next focus on Captain Momchilov's statements or approval of statements made

in the May 29, 2004 press release about Mr. Corsi and Ms. Brothers and statements to "random

callers" made to the Sheriff's Department.  In the complaint plaintiffs' claim the defendants

knowingly and voluntarily continued to report falsehoods to the media and others regarding Mr.

Corsi and his business and that these defamatory and slanderous statements resulted in

5:03 CV 1002                                          25

exploitation of plaintiffs' personality causing outrage, mental suffering, shame and humiliation

to plaintiffs.  (Complaint ¶¶32-33).  From a Constitutional standpoint, there is no basis for

asserting a claim of defamation or humiliation as a claim for constitutional violation under the

Fourth Amendment.


*Detective Linda Kay Rinear*:

Detective Linda Kay Rinear is the central figure in this matter.  She is responsible for the

search warrants on KD Day Care, Mr. Corsi's residence and she signed the affidavits against Mr.

Corsi to enable his arrest and the subsequent criminal prosecution.  Defendants maintain that

Detective Rinear is excused from Fourth Amendment violation because she discussed each

search warrant with prosecutors, she provided the state courts with detailed information

including facts that might lead the state court to deny the search request.  Further, with regard to

the criminal complaints against Mr. Corsi, Detective Rinear claims that this was authorized by

the Cuyahoga Falls Prosecutor, Duane Jones (Aff. ¶¶19, 58-59, Ex. A-1).

To begin with, the prosecutor's involvement does not break the chain of causation.  See

*Jones v. City of Chicago*, 856 F.2d 985, 993-94 (7th Cir. 1998).  "[A] prosecutor's decision to

charge, a grand jury's decision to indict, a prosecutor's decision not to drop charges but to

proceed to trial — none of these decisions will shield a police officer who deliberately supplied

misleading information that influenced the decision."  *Id.*; *DeLoach v. Bevers*, 922 F.2d 618, 621

(10th Cir. 1990).  This flows from the underlying legal principle that judicial scrutiny of a

5:03 CV 1002                                              26

warrant does not confer absolute immunity on the complaining police officer but only qualified

immunity pending on the objective reasonableness of the application.  See *U.S. v. Leon*, 468 U.S.

897, 922 and n. 23, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984); *Malley v Briggs*, 475 U.S. 335, 345,

106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) (extending *Leon*).[7]  "Defendants will not be immune if,

on an objective basis, it is obvious that no reasonably competent officer would have concluded

that a warrant should issue; but if officers of reasonable competence could disagree on this issue,

immunity should be recognized."  *Malley*, 475 U.S. at 341.  *Malley* and *Leon* followed *Franks v.*

*Delaware* where the implicit legal rule that a warrant cannot be based on deliberate falsehood or

reckless disregard of the truth was unfortunately required to be made redundantly explicit.  *Id.*,

438 U.S. 154, 171, 88 S.Ct. 2674, 2684, 57 L.Ed.2d 667 (1978).

*First Search Warrant*:

     With respect to the initial search, plaintiff's concede that Detective Rinear had spoken

with a parent who was "uncomfortable" with their child being taken into a private room, that Mr.

Corsi's individualized attention given to children was corroborated by daycare employees, and

that Detective Rinear had interviewed two children who attended the daycare (C.M. and M.Z.).

---

     [7]   As explained in *Malley* judicial review of an arrest warrant also does not break the chain of causation.:"In
*Leon*, we stated that "our good-faith inquiry is confined to the objectively ascertainable question whether a reasonably
well-trained officer would have known that the search was illegal despite the magistrate's authorization." 468 U.S., at
922, n. 23, 104 S.Ct., at 3420, n. 23. The analogous question in this case is whether a reasonably well-trained officer in
petitioner's position would have known that his affidavit failed to establish probable cause and that he should not have
applied for the warrant. If such was the case, the officer's application for a warrant was not objectively reasonable,
because it created the unnecessary danger of an unlawful arrest. It is true that in an ideal system an unreasonable request
for a warrant would be harmless, because no judge would approve it. But ours is not an ideal system, and it is possible
that a magistrate, working under docket pressures, will fail to perform as a magistrate should. We find it reasonable to
require the officer applying for the warrant to minimize this danger by exercising reasonable professional judgment."
(footnotes omitted)

*Malley v. Briggs,* 475 U.S. at 345-346, 106 S.Ct. at 1098.

5:03 CV 1002                                    27

Further, plaintiffs cannot deny there was at least the appearance of a lack of credibility following the efforts to verify Mr. Corsi and Ms. Brothers' prior employment.  The investigating officers cannot be faulted for being given incorrect information by Canton City Schools' personnel.

The Fourth Amendment's prohibition against unreasonable searches has long been recognized to apply to commercial premises, especially when the property is searched for contraband or evidence of a crime. See *New York v. Burger*, 482 U.S. 691, 699, 724,107 S.Ct. 2636, 2642, 2655, 96 L.Ed.2d 601 (1987); *Donovan v. Dewey*, 452 U.S. 594, 598 n.6, 101 S.Ct. 2534, 2538 n.6, 69 L.Ed.2d 262 (1981). The Fourth Amendment requires that, "[t]he [investigating and supervising] officer must establish probable cause to believe the crime has been committed and that evidence is likely to be found at the place to be searched; must articulate specific items that can be seized, and a specific place to be searched; [and] must obtain the warrant from a magistrate judge. . ." *Groh v. Ramirez* 540 U.S. 551, 568, 124 S.Ct. 1284, 1296, 157 S.Ct. 1068 (2004). As defined in *Illinois v. Gates*:

> [P]robable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.  By hypothesis, therefore innocent behavior frequently will provide the basis for a showing of probable cause; to require otherwise would be to *sub silentio* impose a drastically more rigorous definition of probable cause than the security of our citizens demands . . . In making a determination of probable cause the relevant inquiry is not whether particular conduct is "innocent" or "guilty," but the degree of suspicion that attaches to particular types of non-criminal acts. (citation omitted).

*Id.*, 462 U.S. 213, 245 n.13, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

There clearly was articulable probable cause for the search of the daycare premises for evidence of child pornography, and all requirements under the Fourth Amendment were met.

5:03 CV 1002                                      28

Plaintiffs, however, dwell upon the argument that C.M.'s statements to the detective concerned events that occurred 14 months earlier. "[A] warrant is stale if the probable cause, while sufficient at some period in the past is now insufficient as to evidence at a specific location." *U.S. v. Aboud*, 438 F.3d 554, 572 (6th Cir. 2006); *U.S. v. Jackson*, 470 F.3d 299, 308 (6th Cir. 2006). The [court] should consider the defendant's course of conduct, the nature and duration of the offense, the nature of the relevant evidence, and any corroboration of the information." *U.S. v. Gardner*, 463 F.3d 445, 471 (6th Cir. 2006); *Jackson*, 470 F.3d at 308. There is, however, no "bright line test" for determining when probable cause has become stale. *U.S. v. Koelling*, 992 F.2d 817, 822 (8th Cir. 1993). Staleness is based on the variables of the character of the crime, whether the criminal is nomadic, perishability or transferability of the items to be seized and whether the criminal activity occurs at a transient or fixed location. See *U.S. v. Spikes*, 158 F.3d 913, 923 (6th Cir. 1998).

With regard to allegations of child pornography, the courts have found probable cause was not stale because it is presumed that such material is securely retained by the suspect. See *U.S. v. Sommage*, - F.3d. -, 2007 WL 1052456 *3 (8th Cir. 2007); *U.S. v. Koelling*, 992 F.2d at 823 (pedofile presumed to maintain pornography collection); *U.S. v. Hay*, 231 F.3d 630, 636 (9th Cir. 2000) (information that was six months old was not stale); *U.S. v. Lacy*, 119 F.3d 742, 746 (9th Cir. 1997) (information that was 10 months old was not stale). Since there is no "bright line" standard for measuring staleness and case law has permitted  use of evidence as old as 10 months old in child pornography prosecutions, then plaintiffs have not demonstrated a constitutional violation.

5:03 CV 1002                                        29

Detective Rinear's affidavit did not end there.  There was evidence of continuing investigation and suspicious activity based on interviews with former and current daycare employees, and another child M.Z.  (See Det. Rinear Affidavit for Search Warrant  ¶¶4-5, 8, Ex. A-1).  Plaintiffs have not  shown that a Fourth Amendment constitutional right has been violated under the standard set out in *U.S. v. Spikes.* The contraband was presumably in a fixed location where Mr. Corsi would have access at his daycare abode (investigation showed he slept and showered there) and pornography was not perishable, and likely to be retained.

*Probable Cause for Arrest:*

As made "abundantly clear" in the Fourth Amendment, arrest warrants may only issue upon "probable cause".  *Ahlers v. Schebil*, 188 F.3d 365, 37 (6th Cir. 1999); *Vakilian v. Shaw*, 335 F.3d 509, 517 (6th Cir. 2003); and see *Dunaway v. New York*, 442 U.S. 200, 216,99 S.Ct. 2248, 2258, 60 L.Ed.2d 824 (1979). Probable cause to arrest exists when at the moment the arrest was made, "the facts and circumstances within [the arresting officer's] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225,13 L.Ed.2d 142 (1964); *Hunter v. Bryant*, 502 U.S. 224, 228,112 S.Ct 534, 537, 116 L.Ed.2d 589 (1991).

Commensurate with this, is the requirement from *Franks v. Delaware,* that the warrant for arrest not be obtained by deliberate falsehood or reckless disregard of the truth. See *Franks*, 438 U.S. 154; *Vakilian*, 335 F.3d at 517; *Ahlers v. Schebil*, 188 F.3d at 373. The general rule is "[o]nce probable cause is established, an officer is under no duty to investigate further or look for additional evidence which may exculpate the accused."  *Ahlers*, 188 F.3d at 371.  Under this

rule an officer, "is under no obligation to give any credence to a suspect's story [or alibi] nor should a plausible explanation in any sense require the officer to forego arrest pending further investigation if the facts as initially discovered provide probable cause."  *Id.*, quoting *Criss v. City of Kent*, 867 F.2d 259, 263 (6th Cir. 1988).  However, balanced against this,  "an officer cannot look only at the evidence of guilt while ignoring all exculpatory evidence." *Gardenhire v. Schubert*, 205 F.3d 303, 318 (6th Cir. 2000); *Humphrey v. Mabry*, -F.3d -, 2007 WL 957354 *14 (6th Cir. 2007).  Thus an officer cannot rely on evidence which is contradicted by direct observation.  *Humphrey*, at *14; *Fisher v. Harden*, 398 F.3d 837, 843 (6th Cir.), *cert. denied*, -U.S. -, 126 S.Ct. 838, 163 L.Ed.2d 706 (2005).

Detective Rinear filed affidavits in Cuyahoga Falls Municipal Court and obtained a judicially issued warrant for his arrest.  Ms. Brothers and Mr. Corsi argue that the officer knew that the holes in the ceilings were to allow hoses to run through the ceiling tiles to divert the water from roof leakage,  that the handgun and knife were located in a locked private back room that was not accessible to the children (Brothers Aff. pg. 4, Corsi Aff. pg. 2, Docket No. 60).  Mr. Corsi stated that he knew of no pictures of naked females on his computer and that he was aware only that there was only a Sports Illustrated swimsuit model stored on the computer (Corsi Aff. pg. 1).  Mr. Corsi's affidavit also adds that the video camera that fit the ceiling holes was a recent purchase and was not there at the time of the "imaginary events described by" C.M. (Corsi Aff. pg. 2).

None of the circumstances described by plaintiffs is exculpatory, even when considered with the absence of a vibrating bed, pool, and pull-down ladder from the ceiling.  Plaintiffs quibble over Detective Rinear's affidavit for arrest which stated that the handgun was in an

5:03 CV 1002                                     31

unlocked drawer which was accessible to the children (See Affidavit for Arrest, Ex. A-4, Docket

No. 38).  They do not deny that there was no lock on the drawer, and Detective Rinear was not

required to accept their explanation that the room was kept locked at all times to negate a

reasonable belief in the child endangering charge. After all, one of the daycare employees had

expressed her concern that Mr. Corsi was teaching the children "about shooting guns." (Det.

Rinear Aff. for Search Warrant ¶5, Ex. A-1)

       The more serious charges arose from C.M.'s statement indicating voyeurism - i.e.,

disseminating matter harmful to juveniles, voyeurism, and child endangering in production of

sexually-oriented material.  C.M.'s statement was not discredited given the discovery of the

video camera and the ceiling holes, despite plaintiffs' plausible explanations. The facts do not

demonstrate that Detective Rinear had turned a blind eye toward exculpatory evidence. The

investigation indicated that child pornography was being produced at this location and the

presence of young children,  physical setting and extant means of production uncovered at the

daycare would lend themselves to this endeavor.  Other informants had reported that Mr. Corsi

had taken children individually into a private room and closed and locked the door (Det. Rinear

Aff. for Search Warrant  ¶15, Defs.' Ex. A-1).  M.Z. had reported that there was a secret club for

boys and that Mr. Corsi took pictures of him and other children (Aff. for Search Warrant  ¶18.

Further a parent had complained of her suspicions- the "special treatment" Mr. Corsi gave her

son and Mr. Corsi's defiance of her instruction that her two years old son was not permitted to be

alone with Mr. Corsi.  Reportedly, Mr. Corsi had taken her son into a private room for four

hours.  This parent also complained that while changing her son's diapers and wiping his private

area, her son complained that the area hurt (Aff. for Search Warrant  ¶¶3, 11). Plaintiffs have not

shown an intent to mislead in the obtaining the arrest warrant. No Fourth Amendment violation

has been demonstrated. "The Constitution does not guarantee that only the guilty will be

arrested." *Baker v. McCollan,* 443 U.S. 137, 145, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979).

Moreover, with respect to the bona fideness of the officer's actions, the standard of

objective reasonableness "defines the qualified immunity accorded an officer whose request for a

warrant allegedly cause an unconstitutional arrest." *Malley v. Briggs*, 475 U.S. 344-45, 106 S.Ct.

at 1098.  "Only where the warrant application is so lacking in indicia of probable cause as to

render official belief in its existence unreasonable . . ., will the shield of immunity be lost." *Id.*

Under these circumstances it would not be clear to a reasonable officer that her conduct was

unlawful.  Accordingly, presuming alternatively that there was an unconstitutional arrest in

violation of Mr. Corsi's Fourth Amendment rights, the belief  was objectively reasonable that

probable cause for the arrest existed.

*Second Search Warrant:*

Following the search of the day-care center and Mr. Corsi's arrest, a search warrant was

obtained for his home. Plaintiffs argue that even if the initial search warrant of the day-care

center were based on probable cause, the inconsistencies that became apparent in C.M.'s story

after the first search of the daycare should have precluded the subsequent search of Mr. Corsi's

home.  Plaintiffs contend that Detective Rinear omitted material facts in reckless disregard of the

truth in the search warrant affidavit and she therefore could not be shielded by qualified

immunity.

Plaintiffs contend that the search of Mr. Corsi's residence proceeded on virtually the

same affidavit that Detective Rinear had provided for the earlier search with only a change in the

5:03 CV 1002                                         33

address of the premises to be searched and the addition of the statements that: "based on 11 years experience, people who commit the type of crimes outlined in this affidavit secrete items as memorabilia in their homes; Mr. Corsi had been arrested; and that evidence to support the charges was believed to exist at Mr. Corsi's residence (Affidavit ¶¶15-17, Ex. A-6).  Plaintiffs maintain that the resubmission of the same "facts" in the second affidavit constituted reckless disregard of the truth by Detective Rinear's failure to provide exculpatory information concerning the inconsistencies between C.M.'s story and discoveries made during the first search.  Plaintiffs do not explain what this exculpatory information was, but presumably it was a lack of uncovering a vibrating bed in a private room, pool in the room, and secret door in the ceiling with a pull-down ladder (See Det. Rinear Affidavit ¶7, Ex. A-6). Plaintiffs also focus on Detective Rinear's deposition testimony about her prior consultation with a part-time judge from Carroll County, who advised her to wait until after the day-care center had been searched to obtain more evidence, and "depending on what we found in the day-care center, the judges down there would most likely probably not give us a search warrant for his residence at the same time." (Det. Rinear Depo., pg. 121).

The first question is whether plaintiffs have demonstrated a violation of the Fourth Amendment.  Case law generally has overstepped the first step of qualified immunity analysis and proceeded directly to the second step of qualified immunity whether the warrant application was not lacking in *indicia* of probable cause as to render official belief in its existence unreasonable pursuant to *Malley v. Briggs*.  See *Id*., 475 U.S. at 343-45. Turning to the question of whether there was a constitutional violation under the Fourth Amendment, the touchstone for the existence of probable cause is whether under the totality-of-the- circumstances, "there is a

5:03 CV 1002                                    34

fair probability that contraband or evidence of a crime will be found in a particular place."
*Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).  "When the affidavit
is based on information from an informant, the informant's reliability, veracity, and basis for
knowledge are relevant to whether the affidavit provided probable cause to support the search."
*U.S. v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005); and see *U.S. v. Smith*, 783 F.3d 648, 650-51
(6th Cir. 1986). As stressed in *Gates* under "relevant consideration in the totality-of-the-
circumstances analysis . . . a deficiency in one may be compensated for, in determining the
overall reliability of a tip, by a strong showing as to the other, or by some other indicia of
reliability."  *Gates*, 462 U.S. at 233.

One court has stated that, "[t]he Constitution makes no distinction between arrest and
search warrants.  It simply provides, 'no warrants shall issue but upon probable cause supported
by oath or affirmation and particularly describing the person or things to be seized.'"
*U.S. v. Stephenson* 490 F.Supp. 625, 627 (E.D..Mich. 1979).  In practice, though, in Ohio an
affidavit for arrest is cursory and relatively devoid of details consisting of the officer's summary
of the accusations, whereas affidavits for search warrants are expected to be detailed to allow for
judicial scrutiny. When an affidavit lacks any indicia of the informant's reliability, as this one
did, there must be "substantial independent police corroboration."  *U.S. v. Frazier*, 423 F.3d 526,
532 (6th Cir. 2005).

C.M.'s statement was the core of this investigation and he had stated, "that he has taken
tapes to Mr. Dave's car and put them on the back seat and Mr. Dave said he was taking the tapes
home."  (Det. Rinear Aff. for Search Warrant ¶7, Ex. A-6, Docket No. 38).  There was
corroborative evidence of the veracity of  C.M.'s statement included from the discovery of a

5:03 CV 1002                                           35

bullwhip, wireless video camera, monitor, recording device, and photographs of women in bathing suits.(Det. Rinear Aff. ¶14, Ex. A-6). Detective Rinear explained in her affidavit that sexually explicit materials consisting of photographs in magazines are used for lowering inhibitions of children  (Det. Rinear Aff. for Search Warrant ¶13C, Ex. A-6),   The presence of young children, and extant means of video and audio production uncovered at the daycare provided "substantial independent police corroboration" of child pornography to establish C.M.'s reliability.  See *U.S. v. Frazier*, 423 F.3d at 532.

C.M.'s statement was central to the second search, and plaintiffs argue that there constitutional right s were abridged by the officer's failure to specify inconsistencies from direct observation such as the lack of the vibrating bed, pool and pull-down ladder.  What plaintiffs may be attempting to claim is that in effect, the affidavit gave C.M.'s statement a more favorable "spin" by omitting specific mention of any inconsistencies that would have negative implications on this child's credibility, and arguably, contrary to the Fourth Amendment, that judge was denied the opportunity to assess whether probable cause existed  based on the "totality-of-the-circumstances." However, as set out in *Mays v. City of Dayton*, in order to establish the failure to include potentially exculpatory information in violation of *Franks v. Delaware*, and defeat qualified immunity the plaintiff first must make "a substantial preliminary showing that a false statement knowingly and intentionally or with disregard for the truth was included by the affiant in the warrant affidavit." *Id.*., 134 F.3d 809, 815 (6th Cir. 1998). Applying the *Harlow* standard, "an allegation of malice is not sufficient to defeat immunity if the defendant acted in an objectively reasonable manner." *Malley,* 475 U.S. at 341; *Myers v. Morris*, 810 F.2d 1437, 1457 (8th Cir. 1987), abrogated on other grounds, *Burns v. Reed*, 500 U.S. 478, 111 S.Ct. 1934, 114

L.Ed.2d 547 (1991); *Snell v. Tunnell*, 920 F.2d 673, 698 (10th Cir. 1990).  Subjective bad faith by

an officer alone will not defeat qualified immunity if the officer's conduct was objectively

reasonable.  *Snell*, 920 F.2d at 698; *Myers*, 810 F.2d at 1457; and see *Malley,* 475 U.S. at 345-

346, 106 S.Ct. at 1098 (quoted in footnote 7). The approach to such situations must be tempered

with reason, "[b]ut at some point, an officer's knowledge of false information may defeat a

finding of objective reasonableness."  *Snell* at 698.  "Perjury is not objectively reasonable

conduct."  *Myers*, 810 F.3d. at 1457.  This naturally applies to omissions of information from

affidavits as well.  *Mays*, 134 F.3d at 815.

    As in *Myers v. Morris*, plaintiffs contend that a child's story was incredible. As a matter

of law, deception by a child informant does not directly transfer to the attesting officer.  See

*Myers*, 810 F.2d at 1457. As stated in *Franks v. Delaware*, "[t]he deliberate falsity or reckless

disregard whose impeachment is permitted today is only that of the affiant, not of any

nongovernmental informant."  *Id.*, 438 U.S. at 171; *Myers*, 810 F.2d at 1458. Rather the

plaintiffs must show that the arresting officer knew his informant was lying. *Myers,* 810 F2d at

1458. Plaintiffs refer to  Detective Rinear's deposition where she stated that she believed C.M..

This is not favorable to plaintiffs' burden. Further, the remarks cited earlier from Detective

Rinear and Inspector Thornton show that at least subjectively the officers believed that the

vibrating bed and pool could have been removed in the period following C.M.'s statement.  The

prior search also had uncovered sexually oriented material of nude adult females which

confirmed reports from day-care center staff,  holes in the ceilings over bathrooms and showers

which appeared to be positioned to view the toilet and shower areas of the room, and a video

camera was found which fit the holes found in the ceiling tiles and transmitted a picture to a

television monitor in Mr. Corsi's office.  (See Supplemental Arrest Report, Ex. A-6). These facts do not present a substantial preliminary showing of false statement by the affiant. Plaintiffs' burden is to make a strong preliminary showing that Detective Rinear's omissions were made "with an intention to mislead." *Hale v. Kart*, 396 F.3d 721, 726 (6th Cir. 2005); *Mays*, 134 F.3d at 816.  Consequently plaintiffs have failed to meet the required showing that the affiant had an intention to mislead by excluding critical evidence from the affidavit.  See *Mays*, 134 F.3d at 816.[8]  It was certainly reasonable for the officers to believe that this incriminating evidence had been secreted at Mr. Corsi's home.

Plaintiffs debate the timing of Detective Rinear's claims about the discovery of nude adult female images downloaded on the daycare's computer because plaintiffs claim that these were discovered later after the computer had been removed and its contents subsequently examined. However, there was not mention of these in the affidavit for the second search warrant. Detective Rinear referred only to the females in swimsuits photographs. (Det. Rinear Aff. ¶14, Defs.' Ex. A-6).  Accordingly, defendants prevail on their motion for summary judgment with respect to alleged violation of Fourth Amendment protections.

---

[8] Secondly, plaintiffs are required to establish that the allegedly false statement "was necessary for finding of probable cause." *Mays*, 134 F.3d at 815 ; *Franks*, 438 U.S. at 155-56, 98 S.Ct. at 2676-77; and see *Gregory v. City of Louisville*, 444 F.3d 725, 758 (6th Cir. 2006), *cert. denied*, - U.S. -, 127 S.Ct. 962, 166 L.Ed.2d 707 (2007).  Under this structure, "[t]he inquiry does not continue if the court finds that the exclusion of the allegedly false statement does not result in the lack of probable cause." *Mays*, 134 F.3d at 815. The court understands that as a general rule that "[a]bsent this first preliminary showing, the district court may not engage in the second inquiry related to probable cause" *Hale v. Kart*, 396 F.3d 721, 726 (6th Cir. 2005). Only when the preliminary showing of the affiant engaging in "deliberate falsehood" or "reckless disregard of the truth" in omitting information,  must the court "consider the affidavit including the omitted portions and determine whether probable cause still exists." *Hale*, 396 F.3d at 226; *U.S. v. Atkin*, 107 F.3d 1213, 1217 (6th Cir. 1997).

5:03 CV 1002                                   38

### *State Claims:*

Plaintiffs raise claims under the state constitution, and five (but in reality four) state torts of intentional infliction of emotional distress, false arrest, false imprisonment, defamation, and "unwarranted appropriation or exploitation of the Plaintiffs' personalities." Defendants maintain that Ohio's Political Subdivision Tort Liability Act bars recovery from the County of Summit and its agents against plaintiffs' supplemental claims based on state law.

 "A federal court exercising supplemental jurisdiction over state law claims [under 28 U.S.C. §1367] is bound to apply the law of the forum state to the same extent as if it were exercising its diversity jurisdiction." *Super Sulky, Inc., v. U.S. Trotting Ass'n*., 174 F.3d 733, 744 (6th Cir. 1999); *Chandler v. Speciality Tires of America (Tennessee), Inc*., 283 F.3d 818, 823 (6th Cir. 2002). The federal court is to "apply state law in accordance with the controlling decisions of the state supreme court." *Moore v. Detroit School Reform Bd.*, 293 F.3d 352, 359 (6th Cir. 2002), *cert. denied*, 537 U.S. 1226 (2003); *Thrifty Rent-A-Car Sys., Inc.*, 249 F.3d 450, 454 (6th Cir. 2001).   When the state's highest court has not decided the issue, the federal court must ascertain the state law from "all relevant data." *Garden City Osteopathic Hosp. v. HBE Corp.,* 55 F.3d 1126, 1130 (6th Cir. 1995) quoting *Bailey v. V & O Press Co.*, 770 F.2d 601, 604 (6th Cir. 1985); and see  *Rousey v. U.S.*, 115 F.3d 394, 397 (6th Cir. 1997); *Ellis ex rel. Pendergrass v. Cleveland Mun. School Dist.*, 455 F.3d 690, 698 (6th Cir. 2006).  All relevant data includes the state's intermediate court decisions, restatements of law, law review commentaries and decisions from other jurisdictions on  the "majority" rule. *Rousey*, 115 F.3d at 397; *American and Foreign Ins. Co. v. Bolt*, 106 F.3d 155, 158 (6th Cir. 1997). However, before

5:03 CV 1002                                    39

addressing defendants' defenses, a special note is necessary with respect to the claims of false

arrest/ imprisonment.

Defendants misread Counts 3 and 4 of the Complaint as raising claims for false arrest and

false imprisonment under state law.  Both claims are clearly raised under the Fourth Amendment

to the U.S. Constitution.  However, plaintiffs accede to this argument and respond only with

arguments based on state law.  (Plaintiffs' Response pg. 19-20, Docket No. 60). There can be

only one recovery where a state remedy both comports with due process and serves to vindicate

infringement of constitutional rights.  See *Braley v. City of Pontiac*, 906 F.3d 220, 223-26 (6th

Cir. 1990), citing *Parratt v. Taylor*, 451 U.S. 527 (1981); *Wilson v. Beebe*, 770 F.2d 578 (6th Cir.

1985).  The Sixth Circuit has found that state tort actions for false arrest and false imprisonment

vindicated Fourth Amendment rights.  *Braley*, 906 F.3d at 224. Accordingly,  there is no cause to

hesitate in treating these allegations of false arrest and false imprisonment as matters governed

by state law. The Court shall accordingly accede to convert these claims and consider them only

as pendent state matters.[9]

*State Constitution:*

The particular provision of Ohio's Bill of Rights at issue in this matter concerns Article I,

§14 governing searches and seizures, which reads:

---

[9] Naturally the case could have proceeded under arguments raised under the Fourth Amendment concerning probable cause to arrest (See *Beck v. Ohio*, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964); *Gardenhire v. Schubert*, 205 F.3d 303 (6th Cir. 2000); *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 301-10 (6th Cir. 2005)), and false imprisonment. ( See *Frantz v. Village of Bradford*, 245 F.3d 869, 875 (6th Cir. 2001), overruled on other grounds, *Thacker v. City of Columbus*, 328 F.3d 244 (6th Cir. 2003)).

5:03 CV 1002                                   40

> The right of the people to be secure in their persons, houses, papers, and possessions, against unreasonable searches and seizures shall not be violated; and no warrant shall issue, but upon probable cause, supported by oath or affirmation, particularly describing the place to be searched and the person and things to be seized.

Plaintiffs' reliance on this  state constitutional provision requires a determination of whether Article I, Section 14 of Ohio's constitution is self-executing in order to consider it an actionable claim. " A constitutional provision is self-executing when it is complete in itself and becomes operative without the aid of supplemental or enabling legislation. A provision is not self-executing if its terms duly construed indicate that it is not to become operative without supplemental or enabling legislation."  *State ex rel. Russell v. Bliss*, 156 Ohio St. 147, 151,46 O.O. 3, 5, 101 N.E.2d 289, 291 (1951), quoting former 16 *Corpus Juris Secundum*, Constitutional Law §48 ; and see *State v. Williams*, 88 Ohio St.3d 513, 521-24, 728 N.E. 2d 342, 353-355 (2000).  State jurisprudence has long-recognized that the state's bill of rights is self-executing and requires no legislative or statutory authority to support or implement it. See *Ex parte Berman*, 86 Ohio App.411, 417, 87 N.E.2d 716, 720, 42 O.O. 13, 54 Ohio L.Abs. 327 (1949); 16 *Ohio Jurisprudence 3d*, Constitutional Law §90 (2005).


While Ohio's Supreme Court acknowledges that the state may impose greater restrictions on police activity under its state constitution, it has nonetheless determined that "Section 14, Article I of the Ohio Constitution affords protections that are coextensive with those provided by the Fourth Amendment[.]" *State v. Robinette*, 80 Ohio St.3d 234, 238, 245, 685 N.E.2d 762, 766-67, 771, 1997  - Ohio 343 (1997); and see *State v. Pierce*, 124 Ohio App.3d 592, 596, 709

N.E.2d 203, 206 (10th App. Dist. 1998).  Accordingly, while plaintiffs' state constitutional claims are actionable, they have been resolved in defendants' favor under the preceding analysis of plaintiffs' allegations of Fourth Amendment  violations.

### County of Summit-Governmental Immunity

Pursuant to Ohio's Political Subdivision Tort Liability Act there is a shield provided against political subdivision liability under §2744.02(A). Defendants maintain that they are so shielded.  The Ohio Legislature enacted Chapter 2744 in order to provide immunity to political subdivisions including counties (See Ohio Rev. Code §2744.01(F)) for the acts performed through their employees.[10]  Ohio Rev. Code §2744.02(A)(1) provides in relevant part:

> Except as provided in division (B) of this section, a political subdivision is not liable in damages in a civil action for injury, death, or loss to persons or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function. [11]

Plaintiffs counter that an exception exists to governmental immunity for proprietary functions:

> . . . [P]olitical subdivisions are liable for injury, death, or loss to person or property caused by the negligent performance of acts by their employees with respect to the negligent performance of acts by their employees with respect to proprietary functions of a political subdivision.
>  Ohio Rev. Code §2744.02(B)(2)

---

[10] Ohio Rev. Code §2744.01(F), defines a political subdivision as, "a municipal corporation, township, county or school district, or other body corporate and politic responsible for governmental activities in a geographic area smaller than that of the state."

[11] The Court notes that identical language appears current version of §2744.02(A)(1) effective 4/9/2003.

5:03 CV 1002                                        42

Plaintiffs maintain that the acts of issuing press releases and providing "unverified information"

to callers was a proprietary function of the Sheriff's Department. Plaintiffs contend that

communications by law enforcement officers to the public *via* press release or in responding to

questions over the telephone is a proprietary function since it involves "activities that are

customarily engaged in by nongovernmental persons."  See Ohio Rev. Code

§2744.01(G)(1)(b).[12]

This contention presents an abrupt mistaken shift in focus for plaintiffs because as

explained earlier, the Sheriff's Department is not a party nor is it *sui juris* (See footnote 2).

Presumably then, the objects of the plaintiffs' argument are the county and its sheriff. However,

the sheriff is an employee and not a political subdivision, and as such the focus of the following

analysis is the County of Summit.[13]

---

[12] Ohio Rev. Code §2744.01 G(1) defines a proprietary function as exclusive of any governmental function and in subsections (b)(2)(a) through e identifies the following non-exclusive activities:

(a) The operation of a hospital by one or more political subdivisions;

(b) The design, construction, reconstruction, renovation, repair, maintenance, and operation of a public cemetery other than a township cemetery;

(c) The establishment, maintenance, and operation of a utility, including but not limited to, a light, gas, power, or heat plant, a railroad, a busline or other transit company, an airport, and a municipal corporation water supply system;

(d) The maintenance, destruction, operation, and upkeep of a sewer system;

(e) The operation and control of a public stadium, auditorium, civic or social center, exhibition hall, arts and crafts center, band or orchestra, or off-street parking facility.

Ohio Rev. Code §22744.01(G)(b)(2)(a)-(e).

[13] This Court views the sheriff as an employee of the political subdivision, i.e.,county. Ohio Rev. Code §2744.01(B) defines employee to include "any elected or appointed official of a political subdivision." See *Waggoner v. Carsey*,129 Ohio App.3d 79,83, 716 N.E.2d 1225 (1998); *Simpson v. White*, 1997 WL 86313 (Ohio App 12 Dist); *Young v. Summit Cty.*, 67 Ohio App.3d 661, 663-64, 588 N.E.2d 169 (9th Dist. 1990), appeal dismissed, 55 Ohio St.3d 705, 562 N.E.2d 898 (Table 1990). Alternatively, Ohio's Tenth Appellate District has recognized the "sheriff's

5:03 CV 1002                                  43

Resolution of the immunity question requires a "three-tiered" analysis under Ohio law.

See *Cater v. City of Cleveland*, 83 Ohio St.3d 24, 28, 697 N.E.2d 610 (1998); *Butler v. Jordan*,

92 Ohio St.3d 343, 357, 750 N.E.2d 554 (2001); *Greene Cty. Agricultural Soc. v. Liming*, 89

Ohio St.3d 551, 733 N.E.2d 1141 (2000);  *Ryll v. Columbus Fireworks Display Co., Inc*., 95

Ohio St.3d 467, 469-70, 769 N.E.2d 372 (2002).  The first tier is to determine whether the

County of Summit engaged in a governmental function.  *Ryll*, 95 Ohio St. 3d at 469; *Greene Cty.*

*Agricultural Soc*., 89 Ohio St.3d at 557.  Law enforcement services are considered a government

function. See Ohio Rev. Code §2744.01(C)(2)(a); *Haas v. Hayslip*, 51 Ohio St. 2d 135,136,  5

O.O.3d 110, 364 N.E.2d 1376. 1377-78 (1977), overruled on other grounds, *Haverlack v.*

*Portage Homes, Inc*., 2 Ohio St.3d 26, 442 N.E.2d 749 (1982) .

Because it is undisputed that the county is a political subdivision, the general rule of

immunity from damages applies. See *Ryll,* 95 Ohio St.3d at 469.  Only, ". . . when the political

subdivision at issue is not one of the bodies specifically mentioned within R.C. 2744.01(F), the

exceptions to immunity of R.C. 2744.02(B) should be construed in a way that leads to a finding

of immunity for only the central core functions of the political subdivision."  *Greene Cty.*

department" as an extension of the "county." See *Williams v. Franklin County, Ohio Sheriff's Dept*., 84 Ohio App. 3d 826, 619 N.E.2d 23 (10th Dist. 1992), appeal dismissed 66 Ohio St.3d 1485, 612 N.E.2d 1242 (Table 1993); *Twine v. Franklin Cty. Sheriff's Dept.* 68 Ohio App.3d 51, 587 N.E.2d 411 (10th Dist. 1990);. Ohio's Twelfth District has accorded the "Sheriff's Office" recognition as "a body corporate and politic." *Jones v. Franklin Cty. Sheriff's Dept*., 1999 WL 527782 (12th Dist. 1999). But see *Saunders v. McFaul*, 71 Ohio App.3d 46, 593 N.E.2d 24 (8th Dist. 1990), (finding sheriff was not included in definition of "political subdivision", but not next considering whether sheriff was an "employee").

5:03 CV 1002                                                44

*Agricultural Soc.*, 89 Ohio St.3d at 560.  When the body politic is not specifically identified by statute then subsequent legal analysis must focus on the specific activity, which in *Greene Cty. Agricultural Soc.* was the "proprietary function" of a livestock competition even though the agricultural society performed a governmental function of education.  *Id.*, 89 Ohio St.3d at 555-56, 559-60. A county, on the other hand, is specifically identified in Ohio Rev. Code §2744.01(F), so, conversely, immunity is not constrained to the "central core function," and should be given broad sway. Compare *Id.,* 89 Ohio St. at 560.

Plaintiffs apparently construe the functions involved as responding to telephone calls and issuing press releases, as a proprietary function of the county.  Plaintiffs could narrow these asserted functions further to the alleged acts of slanderous statements and written libel. [14]   The provision of police services, though, by statute is a "governmental function" for which there is immunity.  See Ohio Rev. Code §2744.01(C)(2)(a); §2744.02(A)(1). Plaintiffs appear to be leveraging their position by the lack of a specific definition of what constitutes police service. However the roles of statutory construction requires that the words be given their ordinary and natural meaning unless the statute indicates that the legislature intended an alternative meaning. *Laymen v. Woo*, 78 Ohio St.3d 485, 487, 678 N.E.2d 1217, 1997 - Ohio - 195 (1997); *Thompson Elec., Inc. v. Bank One*, 37 Ohio St.3d 259, 264, 525 N.E.2d 761 (1988).  The goal is to give effect to the legislature's intention.  See *Cline v. Ohio Bur. of Motor Vehicles*, 61 Ohio St.3d 93, 97, 573 N.E.2d 77 (1991).

---

[14] See *A&B Abell Elevator Co., Inc., v. Columbus/Central Ohio Bldg. & Construction Trades Council*, 73 Ohio St.3d 1, 7 (1995), pointing out that plaintiff's defamation claim was in fact a claim for libel, "a false written publication made with some degree of fault, reflecting injuriously on a person's reputation, or exposing a person to public hatred, contempt, ridicule or shame or disgrace, or affecting a person adversely in his or her trade, business, or profession."

5:03 CV 1002                                    45

Aside from the fact that it is well-established that police services are a governmental and not a proprietary function, [15] state caselaw has viewed the provision or nonprovision of police services under Ohio Rev. Code §2744.01(C)(2)(a) expansively.  See *Estate of Graves v. City of Circleville*, 2005 WL 503372, 2005- Ohio- 929 (Ohio App. 4 Dist.) (Municipal impoundment of motor vehicle following arrest for driving under influence of alcohol and/or drugs); *Haas v. Hayslip*, 51 Ohio St.2d at 135 (alleged intentional shooting by municipal plaintiffs and negligent employment of police officers by city).  *McCloud v. Nimmer*, 76 Ohio App.3d at 535 (municipal off-duty officer's gun discharged and accidentally injured officer's friend during impromptu demonstration of disarming techniques).  *Schoenfield v. Navarre*, 164 Ohio App.3d 571, 843 N.E.2d 234, 238, 2005- Ohio- 6407 (2005) (immunity from wrongful death action following suicide of "suspicious" individual who had been questioned after purchasing a firearm); *Maggio v. City of Warren*, 2006 WL 3772258 *5-6, 2006 - Ohio - 6880 (Ohio app. 11 Dist.) (immunity for homeowners' assault, battery, false arrest, malicious prosecution and intentional and negligent infliction of emotional distress claims arising from police intrusion to capture fleeing suspect hiding in home). More to the point, police service has also included release of an expunged criminal record to news media containing embarrassing information.  *Villa v. Village of Elmore*, 2005 WL 3440787 *6, 2005-Ohio-6649 (Ohio App. 6 Dist.). In that matter, the village released the personnel file of a discharged police officer containing subpoenas relating to expunged criminal charges against the former officer.  *Id.*, ¶¶12-13, 15.  The state appellate court found immunity because this related to the provision of police services. *Id.*, ¶35.  It is apparent

_____

[15] See *McCloud v. Nimmer*, 72 Ohio App.3d 533, 538, 595 N.E.2d 492 (1991).  *Haas v. Akron,* 51 Ohio St.2d 135, 364 N.E.2d 1376 (1977), overruled on other grounds, *Haverlack v. Portage Homes, Inc.*, 2 Ohio St.3d 26, 442 N.E.2d 749 (1982).

5:03 CV 1002                                46

that police services covers a broad range of activities associated with the performance or nonperformance of police work.

The second of the three tiers is the point at which there is resolution of whether any exception to the general rule of immunity is found in Ohio Rev. Code §2744.02(B)(1)-(5). See *Greene Cty. Agricultural Soc.,* 89 Ohio St.3d at 557; *Ryll*, 95 Ohio St.3d at 470. Plaintiffs appear to contend that the "proprietary function" exception of Ohio Rev. Code §2744.02(B)(2) is applicable, but again, police services are by definition governmental.

As for the third tier under this structured analysis, it is at this point where  defenses under Ohio Rev. Code §2744.03 are considered. Review becomes necessary only when one of the listed exceptions is found under the second tier. *Id*.  Accordingly, giving police services its ordinary and natural meaning, defendant County of Summit is immune from suit under Ohio's Political Subdivision Tort Liability Act from plaintiffs' allegations of police misconduct in issuing press releases and providing "unverified information" to callers.  Aside from the challenge to the constitutionality of Ohio Rev. Code §2744.02(A)(1), which shall be addressed later, plaintiffs present no other basis to overcome governmental immunity.[16]

---

[16] Ohio's courts have shielded governmental units from the torts asserted by plaintiffs.  *E.g.*, false arrest /imprisonment.  *Vasquez v. Village of Windham*, 2006 WL 3478417, 2006 - Ohio - 6342 (Ohio App. 11 Dist.); *Ziegler v. Mahoning Cty. Sheriff's Dept.*, 137 Ohio App.3d 831, 739 N.E.2d 1237 (2000); defamation, *Dennis v. Coventry Local School Dist. Bd. of Ed.*, 2006 WL 1540840, 2006 - Ohio - 2847 (Ohio App. 9 Dist.); *Jones v. Franklin Cty. Sheriff's Office*, 1999 WL 527782 (Ohio App. 12 Dist.); invasion of privacy, *Villa v. Village of Elmore,* 2005 WL 3440787 (Ohio App. 6 Dist.); intentional infliction of emotional distress, *Maggio v. City of Warren*, 2006 WL 3772258, 2006 - Ohio - 6880 (Ohio App. 11 Dist); *Ramey v. Mudd*, 154 Ohio App.3d 582, 798 N.E.2d 57 (2003).

5:03 CV 1002                                           47

### County of Summit - Employees

*Sheriff, County Councilmembers and County Executive:*

Plaintiff has shown no involvement by the county's governing officials. With respect to the sheriff, Ohio Revised Code §311.05 limits the Sheriff's responsibility for the actions of his deputies to instances where he orders the action taken, has prior knowledge, participates in acts in reckless disregard or ratifies the neglect of duty or misconduct of the deputy.  The sheriff cannot be held liable for damages arising out of a deputy sheriff's warrantless arrest where there is no indication that the sheriff was directly involved in any way with the arrest.  See *Ridgeway v. Union Cty. Comm'rs*, 775 F.Supp. 1105 (S.D. Ohio 1991).  Plaintiffs have failed to establish *respondeat superior* within these statutory constraints and consequently summary judgment must be granted in favor of Sheriff Alexander in his individual capacity with regard to state law-based claims.

With respect to the governing members of county government, there is no legal authority which would hold them liable in a personal or individual capacity to respond out of their personal funds for tortious actions of subordinates.  Moreover, plaintiffs have not alleged any personal involvement in the torts alleged of county council or the county executive.  Given that the county itself is shielded by immunity under Ohio Rev. Code §2744.02(A)(1), plaintiffs have failed to overcome defendants' motion for summary judgment regarding these individuals.

*False Arrest and False Imprisonment:*

Plaintiffs have conceded to defendants that the elements of the  torts of both false arrest and false imprisonment are indistinguishable and require: first, that the person conducting an arrest or detention had no authority to do so; and second, that the arrest or detention was not

conducted according to proper legal procedures.  See *Feliciano v. Kreiger*, 50 Ohio St.2d 69, 71,

4 O.O.3d 158, 362 N.E.2d 646 (1977); *Rogers v. Barbera*, 170 Ohio St.2d 241, 243-44, 164

N.E.2d 162 (1960) (false arrest and false imprisonment are indistinguishable); and see *Thacker v.

City of Columbus,* 328 F.3d 244, 261 (6th Cir. 2003) (applying two-prong test to allegations of

false arrest).  Defendant employees argue that there was no false arrest/imprisonment because

there was probable cause to arrest.  Whether there is probable cause to arrest, however,  is not

the appropriate line of inquiry.  See *Thacker*, 328 F.3d at 261. State law holds with respect to

false arrest's twin , false imprisonment, that  "[f]alse imprisonment *per se* is not concerned with

good or bad faith, malicious motive, want of probable cause on the part of the prosecuting

witness, or the officer causing the imprisonment.  If the imprisonment was lawful, it is not the

less lawful that any or all of the foregoing elements existed." *Brinkman v. Drolesbaugh*, 97 Ohio

St. 171, 119 N.E. 451 (Syllabus ¶2) (1918); *Durbin v. Ohio State Highway Patrol*, 83 Ohio

App.3d 693, 697, 615 N.E.2d 694 (1992); *Tucker v. Kroger Co.*, 133 Ohio App.3d 140, 726

N.E.2d 1111 (1999). Substituting detention or arrest for "imprisonment" in the foregoing

passage serves to refine the elements of false arrest.

  As noted in *Rogers*, "[a] suit for false arrest or false imprisonment is the proper action

where the aggrieved party is arrested without legal process, or under a void process; but where

the process on which the arrest is made is regular on its face, but is sued out maliciously and

without probable cause, the remedy is an action for malicious prosecution."  *Id.* 170 Ohio St. at

244, quoting 22 Am. Jur. 353, false imprisonment §§2-3 (1939).  This point has also been

phrased that "an action for false imprisonment cannot be maintained where the wrong

complained of is imprisonment in accordance with the judgment order of a court, unless it

5:03 CV 1002                                         49

appears that such judgment or order is void." *Diehl v. Friester*, 37 Ohio St. 473, 475 (1882);

*Bennett v. Ohio Dept. of Rehab. & Corr.*, 60 Ohio St.3d 107, 111, 573 N.E.2d 633 (1991).  Thus,

an arrest in accordance with a facially valid warrant is a complete defense.  See *Brinkman*, 97

Ohio St. 171 (syllabi ¶4-6).  Plaintiffs have not shown that the arrest warrant was "void."

Consequently, there is no genuine issue of material fact with respect to the allegations of false

arrest/imprisonment.


*Defamation:*

Defamation has two forms in Ohio, liable and slander.  Slander refers to spoken

defamatory words while liable refers to written matters or matters broadcast on radio and

television.  See *Elsass v. Tabler*, 131 Ohio App.3d 66, 70-71, 721 N.E.2d 503 (1999); *Sweitzer v.

Outlet Comm., Inc.*, 133 Ohio App.3d 102, 108, 726 N.E.2d 1084 (1999); *Perez v. Scripps-

Howard Broadcasting Co.*, 35 Ohio St.3d 215, 520 N.E.2d 198 (1988).  This tort has four

elements: "a false and defamatory statement concerning another; unprivileged publication to a

third party; fault amounting to at least negligence by the publisher; actionability of the statement

irrespective of a special harm or the existence of a special harm."  *Akron-Canton Waste Oil, Inc.

v. Safety-Kleen Oil Serv., Inc.*, 81 Ohio App.3d 591, 601, 611 N.E.2d 955, 962 (1992) quoting

3 Restatement of the Law2d Torts §558, pg. 155 (1977); and see *Jackson v. City of Columbus*,

194 F.3d 737, 757 (6th Cir. 1999).  Plaintiffs present the affidavit of Ms. Brothers to support this

claim with the following allegations:

> In the Affidavit for Search Warrant of KD Day Care, Detective Rinear
> said that I had given false information to Holland-Vincer concerning my
> status as a retired teacher when she stated "Claudia Brothers was not

found as an employee of the Canton School District."  The Affidavit is a matter of public record and was used as a source for media information that was highly publicized much to my embarrassment.

The Sheriff's department gave false and misleading information to the media when they stated that David's misdemeanor of child endangering involved having a loaded 9 mm pistol and a 12-inch knife in the unlocked drawer in a private office accessible to the children of the day care center."  I had unlocked those rooms for the detectives.  They were in a private bathroom used exclusively by myself and David Corsi.  Only he and I had the keys to that bathroom because we kept cleaning agents that could be dangerous to kids in that room.

I was also embarrassed by the Affidavit's statement "that Mr. Corsi and Ms. Brothers are personally involved with each other and like to take bus trips for recreation."  This statement resulted in publication of my private affairs with which the public had no legitimate concern.  These statements led to further humiliation when the media reported that I was Corsi's "live-in girlfriend."  David and I are long term friends and business partners.

Due to the release of the affidavit for search, I was subjected to being photographed and videotaped by local media without my permission at my business, in my car, and at municipal and county courts.  Reporters attempted to interview me in person and by telephone, interrupting the performance of my duties as Administrator of KD Day Care and disrupting my personal life.

The outrageous false statements in the affidavit and the arrest and jailing of my friend and business partner had a devastating emotional impact on me.

Some parents called after the arrest to say that the Sheriff's Department had interviewed their children.  Linda Rinear claims that so called confidentials exist for every interview.  Yet no confidentials exist for interviews of a mother Helen Gorzelancik, the Ferrara children, or the Wodarcyk's child.  The parents expressed to me that they knew nothing like what was reported in the press had ever happened and that their children were happy at the day care.  Several of the children from the above families and several of the children who were interviewed such as the Christley child still attend before school programs, after school programs and summer programs at the day care.

> The actions of the Summit County Sheriff's department over the following
> six months left everything David and I had built in the business in ruins.
> The business has never recovered from the false allegations made against
> David.  My lifelong reputation as a caring, competent teacher and
> caregiver for children was severely damaged.

(Brothers Aff., Docket No. 60).

Plaintiffs also refer to deposition testimony in their responsive brief from Capt. Momchilov and

non-party Inspector Thornton.[17]

The first alleged defamatory act is the statement in the affidavit for search warrant

concerning Ms. Brothers' allegedly falsified employment history.  The defendants raise the

defense of qualified privilege.  Privilege exists when publication is "fairly made by a person in

the discharge of some public or private duty, whether legal or moral, or in the conduct of his own

affairs, in matters where his interest is concerned."  *Hahn v. Kotten*, 43 Ohio St.2d 237, 244, 331

N.E.2d 713 (1975).  Thus, "where circumstances exist, or are reasonably believed by the

defendant to exist, which casts on him the duty of making a communication to assert another

person to whom he makes such communication in the performance of such duty, or whether the

person is so situated that it becomes right in the interests of society that he should tell third

persons certain facts, which he in good faith proceeds to do, . . ." the communication is

qualifiedly privileged.  *Hahn* at 245-246 and see *Davis v. City of Cleveland*, 2004 WL 2829027

*7 (Ohio App. 8 Dist.).  In general, a police officer's allegedly defamatory statement made

during the course of an investigation is at least protected by qualified privilege.  See *Black v.*

---

[17] The court does not believe it is plaintiffs' intent to argue that the deposition testimony constituted defamation and moreover statements made in depositions during pending litigation are absolutely privileged.  See *Palmer v. Pheils*, 2004 WL 2940815 *6, 2004 - Ohio - 6975 (Ohio App. 5 Dist.).

5:03 CV 1002                                    52

*Cleveland Police Dept.*, 96 Ohio App. 3d 84 (1994); *Davis v. Warrensville Heights*, 1998 WL

12337 (Ohio App. 8 Dist.).  The essential elements of a qualified communication are good faith,

an interest to be upheld, a statement limited in scope to this purpose, a proper occasion and

publication in a proper manner and the proper parties only."  *Hahn, supra.*, *Davis v. City of

Cleveland, supra*; *Sharma v. Hummer*, 2001 WL 460281 *6, (Ohio App. 6 Dist.).  There is no

question that Detective Rinear's statement in her affidavit presented to the court to obtain a

search warrant is so privileged.  Moreover, the public has an interest in the investigation as it

concerned while not a "public school" as in *Sharma*, but certainly a daycare center which is open

to the public and is certainly just as vital a part of the community and concerning the public

safety.  Plaintiffs argue only that malice be inferred from the proof of lack of probable cause

citing *Melanowski v. Judy*, 102 Ohio St. 153, 155, 131 N.E. 360 (1921).  However, as explained

previously in discussing the Fourth Amendment claims, there was probable cause and plaintiffs

have certainly failed to establish a genuine issue of material fact regarding the claim that malice

should be inferred because the deputies had lacked probable cause to search and to arrest.  The

fact that the officers conveyed erroneous information gathered in their investigation does not

overcome the qualified privilege.

Next plaintiffs claim that the "Sheriff's Department" misinformed the media concerning

the location of the loaded 9 .mm pistol and 12-inch knife as located in an accessible private

office as opposed to an inaccessible private bathroom.

Again there is the qualified privilege of reporting on matters of public concern during the

pending criminal investigation.  See *Sharma v. Hummer*, 2001 WL 460281 at *6-7.  *McCartney

v. Oblates of St. Francis deSales*, 80 Ohio App.3d 345, 609 N.E.2d 216 (1992).  To overcome

this the plaintiff must show actual malice under its common law definition of "ill will, hatred, a spirit of revenge, or a conscious disregard of the right and safety of the other persons which has great probability of causing substantial harm." *Varanese v. Gall*, 35 Ohio St.3d 78, 79, 518 N.E.2d 1177 (1988); *Preston v. Murty*, 32 Ohio St.3d 334, 512 N.E.2d 1174 (1987).  The deposition testimony offered by plaintiffs supports defendants' position  that their statements were made with the belief that the gun and knife were "accessible."  This evidence clearly does not demonstrate "actual malice" to overcome the qualified privilege.

As for the statement of personal involvement between plaintiffs, plaintiffs have not met their burden of establishing by clear and convincing evidence that the alleged statements at issue were false.  See *Dale v. Ohio Civ. Serv. Empl. Assn.*, 57 Ohio St.3d 112, 114 (1991); *Lansdowne v. Beacon Journal Pub. Co.*, 32 Ohio St.3d 176, 178-81 (1987).  *E.g. Dennis v. Coventry Local School Dist. Bd. of Ed.*, 2006 WL 150840 *7, 2006 - Ohio - 2847 (Ohio App. 9 Dist.) (plaintiff failed to show statements by school board to press concerning allegations of inappropriate sexual conduct with students on overnight field trip constituted malicious purpose, bad faith, or conduct of a wanton or reckless manner).

*Invasion of privacy/ appropriation of personalities:*

In *Housch v. Peth*, the Ohio Supreme Court recognized for the first time the tort of invasion of privacy but included only three of its forms, wrongful appropriations of one's name or likeness, publication of embarrassing private facts, and intrusion upon seclusion.  *Id.*, 165 Ohio St. 35, 59 O.O. 60, 133 N.E.2d 340 (1956). Plaintiffs allege the  appropriation of personalities, the  first form of invasion of privacy.  As explained in *Restatement of Torts*, appropriation is the use of plaintiff's name or likeness to advertise defendants' business or

5:03 CV 1002                                      54

product, or in a noncommercial setting makes use of the name or likeness for defendants's own

purposes and benefit. *Restatement (Second) of Torts* §652C(b) Comment (1977). The restatement

goes on to explain that while the tort generally occurs in a commercial setting, commercial use is

not an element, and illustrates this point with an example of a situation of a private detective

impersonating another to gain confidential information which would not have otherwise been

disclosed. *Id.*, Illus.  Nothing in plaintiffs' affidavits establishes this allegation to demonstrate a

factual basis for  appropriation of plaintiffs' personalties.

      However the complaint does go on to state that these actions resulting in a publication of

plaintiffs' private affairs to the public in matters in which the public had no legitimate concern-

the second form of invasion of privacy. See *Sustin v. Fee*, 16 Ohio St.2d 143, 23 O.O.3d 182,

431 N.E.2d 992 (1982); *Restatement (Second) of Torts* §652B.  Reporting arrest charges and

matters in the public record is not a revelation of secret or private concerns.  See *Haynik v.

Zimlich*, 30 Ohio Misc.2d 16, 21-22, 508 N.E.2d 195, 200 (C.P. Cuyahoga Ct. 1986).

      The tort of public disclosure requires (1) publicity of a public nature, not private; (2) that

the disclosure concerned facts about the plaintiff's private life not his public life; (3) that the

publicized matter would be highly offensive and objectionable to a reasonable person of ordinary

sensibility; (4) that the disclosure was intentional, not negligent, and (5) that the publicized

matter must not be a legitimate concern to the public.  *Killilea v. Sears, Roebuck & Co.*, 27 Ohio

App.3d 163, 166-67, 499 N.E.2d 1291 (1985); *Early v. The Toledo Blade*, 130 Ohio App.3d 302,

342, 720 N.E.2d 107 (1998).

      The first statement concerning the allegedly false information given to Ms. Holland-

Vincer was not a private matter but concerned the state's regulatory oversight of daycare centers

5:03 CV 1002                                55

and results of this state employee's investigation into Ms. Brothers' background.  It thus was a

matter of public concern.  The same holds true with the presence of the loaded handgun and 12-

inch knife at the daycare especially given the plaintiff's evidence that the sheriff's deputies

believed that the firearm was accessible to the children.  This establishes that the publication was

made at most negligently and not intentionally.  The third allegation concerning the relationship

between Mr. Corsi and Ms. Brothers was as alleged in Detective Rinear's affidavit to obtain a

search warrant.  Public concern existed since the officer was demonstrating a nexus between Mr.

Corsi and Ms. Brothers due to her alleged involvement with Mr. Corsi as a possible accessory in

the contraband the officers were searching.  Moreover the invasion of privacy must intrude into a

truly private matter, and not a matter which plaintiff has made public.  See *Pollack v. Rashid*,

117 Ohio App.3d 361, 369, 690 N.E.2d 903 (1996).  Detective Rinear obtained this in formation

from Ms. Hollan-Vincer of the Department of Human Services who oversaw the daycare and had

conducted regulatory inspections.  (See Det. Rinear Aff. for Search Warrant, ¶12, ex. A-1,

Docket No. 38).  Thus, the matter had not been truly private.   Thus it is a revelation that Ms.

Brothers also was under criminal investigation.  Finally, the allegations concerning the missing

confidential investigative reports in no way support a claim for invasion of privacy.

*Intentional Infliction of Emotional Distress:*

        Plaintiffs argue that they suffered intentional infliction of emotional distress because their

private lives were revealed to the public, that they suffered from false statements which

destroyed their reputation as caregivers, and that they were the victims of an investigation by

defendants who are proceeding without probable cause and who knew that this would hurt

plaintiffs.

5:03 CV 1002                                      56

A claim of intentional infliction of emotional distress (IIED) requires defendant to show, "(1) that the defendant intended to cause the plaintiff serious emotional distress, (2) that the defendant's conduct was extreme and outrageous, and (3) that the defendant's conduct was the proximate cause of plaintiff's serious emotional distress."  *Phung v. Waste Mgt., Inc.*, 71 Ohio St.3d 408, 410, 644 N.E.2d 286 (1994); *Reamsnyder v. Jaskolski*, 10 Ohio St.3d 150, 462 N.E.1d 392 (1984).  Ohio's Supreme Court has stressed that IIED, as defined in *Yeager v. Local Union 20*, 6 Ohio St.3d 369, 453 N.E.2d 666 (1983), and *Reamsnyder v. Jaskolski*, *supra*, requires conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community."  *Reamsnyder*, 10 Ohio St.3d at 153.  The allegations in the amended complaint fail to rise to a claim of IIED.

Plaintiffs have not shown intent to cause serious emotional distress that would exceed the distress associated generally with being the focus of criminal investigation and prosecution. Further the defendant employees acted with probable cause and pursuant to judicially issued search warrants and Mr. Corsi's arrest was upon the prosecutor's consent.

The evidence offered by plaintiffs simply does not demonstrate outrageous and extreme conduct beyond the bounds of decency.  See *Roe v. Heap*, 2004 WL 1109849 *29, 2004 -Ohio - 2504 (Ohio App. 10 Dist.) (involving substantially a more egregious situation where the IIED claim was not sustained by facts showing that a male juvenile  was falsely accused of being a convicted sex offender by  parents of other diving team members in an effort to exclude him from diving team activities.

5:03 CV 1002                                             57

*Employee Immunity*:

Ohio's Political Subdivision Tort Liability Act in §2744.03(A)(6) provides  employees

immunity from liability unless acts or omissions were "manifestly outside the scope of the

employee's employment or official responsibilities," or were "with malicious purpose, in bad

faith, or in a wanton or reckless manner."[18]

> "Malice" has been defined as "the willful and intentional design to do injury or
> the intention or desire to harm another, usually seriously, through conduct which
> is unlawful or unjustified." *Cook v. City of Cincinnati,* 103 Ohio App.3d 80, 90-
> 91, 658 N.E.2d 814 (Ohio Ct.App.1995) *citing Jackson v. Butler Cty. Bd. of
> Comm'rs.,* 76 Ohio App.3d 448, 602 N.E.2d 363 (Ohio Ct.App.1991). "Bad
> faith," on the other hand, is defined as "a dishonest purpose, conscious
> wrongdoing, the breach of a known duty through some ulterior motive or ill will,
> as in the nature of fraud, or an actual intent to mislead or deceive another." *Id.*
> "Wanton misconduct" is characterized by "the failure to exercise any care
> whatsoever." *Cook,* 103 Ohio App.3d at 90-91, 658 N.E.2d 814 *citing Fabrey v.
> McDonald Police Dept.,* 70 Ohio St.3d 351, 356, 639 N.E.2d 31, 35 (Ohio 1994)
> ("mere negligence is not converted into wanton misconduct unless the evidence
> establishes a disposition to perversity on the part of the tortfeasor."); *Hawkins v.
> Ivy,* 50 Ohio St.2d 114, 363 N.E.2d 367 (Ohio 1977). "Reckless conduct" occurs
> when a person "does an act or intentionally fails to do an act which it is his duty
> to the other to do, knowing or having reason to know of facts which would lead a
> reasonable man to realize, not only that his conduct creates an unreasonable risk
> of physical harm to another, but also that such risk is substantially greater than
> that which is necessary to make his conduct negligent." *Thompson v. McNeill,* 53
> Ohio St.3d 102, 104-105, 559 N.E.2d 705 (Ohio 1990).
>
> *Davis v. City of East Cleveland, Ohio,* 2006 WL 753129, *14 (N.D. Ohio 2006)

---

[18]  In addition to any immunity or defense referred to in division (A)(7) of this section and in circumstances
not covered by that division or sections 3314.07 and 3746.24 of the Revised Code, the employee is immune from liability
unless one of the following applies:

> (a) the employee's acts or omissions were manifestly outside the scope of the employee's employment or
> official responsibilities.
> (b) The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or
> reckless manner;

Ohio Rev. Code §2744.03(A)(6)(a) and (b) (Anderson 2000)(Identical to current version effective  4-9-2003).

5:03 CV 1002                                      58

Defendant employees have established that these actions were not manifestly outside the scope of employment or official responsibilities with regard to the searches and Mr. Corsi's arrest.

Further a matter raised by plaintiffs, but not appearing in their affidavits concerned a press release.  The press release announced Mr. Corsi's arrest on two counts of child endangering, one count of disseminating matter harmful to children and one count of voyeurism. It also included the results of the search including a "loaded" 9 mm pistol, a 12-inch Bowie knife, a leather bullwhip, two video cameras, a computer, various videotapes, a television monitor and various photos depicting nudity.  All these statements were true.  Plaintiffs' complain, however, that the press release did not place these revelations in a proper "context" for the public because it failed to mention that no pictures of nude children were found, that the whip was used as a toy by the children pretending to be Indiana Jones and that the gun and knife were a locked room not used by the children.

The issuance of a press release by government officials is action under Ohio Rev. Code §2744.03(A)(6)(a) as within "the scope of the employee's employment or official responsibilities."   The state courts have relied on the Supreme Court's recognition in *Barr v. Mateo*, 360 U.S. 546 (1959), yet the issuance of a press release by a high public officials has become standard . . .  practice . . . with many government agencies" and "in the line of duty."  *Id.* at 574-75.  See *Whiting v. Coyne*, 1996 WL 492266 at *2-3 (Ohio App. 8 Dist.). Plaintiffs shown that Captain Momchilov's actions were with malicious purpose, in bad faith or wanton or conducted in a reckless manner to except this from a general grant of immunity under subpart b of §2244.03(A)(6). Assuming plaintiffs are attempting to assert that Captain Momchilov was

5:03 CV 1002                                        59

negligent and consequently defamatory, plaintiffs must prove negligence by clear and

convincing evidence.   See *Parry v. Mohawk Motors of Michigan, Inc.*, 236 F.3d 299, 312 (6th

Cir. 2000); *Landsdowne v. Beacon Journal Pub'g. Co.* 32 Ohio St.3d 176, 512 N.E.2d 979, 984

(1987); *Garrett v. Fisher Titus Hospital*, 318 F.Supp.2d 562, 577 (N.D. Ohio 2004). They have

failed on this point also.

        Plaintiffs again outside of their affidavits complain about the conversations between the

public about their daycare or them personally and sheriff's deputies.  Plaintiffs have attached

pages of transcribed conversations without indicating where any defamation occurred.  It is not

the court's function to peruse the record and independently ascertain the point, if any, that

defamation allegedly occurred.

         In any event, plaintiffs have failed to demonstrate  "wilfulness or reckless misconduct

that involve[s] an 'intentional deviation from clear duty or from a definite rule of conduct, a

deliberate purpose not to discharge some duty necessary to safety, or purposely doing wrongful

acts with knowledge or appreciation of the likelihood of resulting injury." *Tighe v. Diamond*,

149 Ohio St. 520, 527 (1948); *Vasquez v. Village of Windham*, 2006 WL 3478417 *7, 2006 -

Ohio- 6342 (Ohio App. 11 Dist.).  The evidence presented by plaintiffs does not demonstrate that

the investigation, searches, or arrest were conducted with perversion of will or perverse

discharge for known risk of the possibility of injury which resulted.  See *Vasquez*, *supra*.

Accordingly, there is no genuine issue of material fact which obstructs the defendant employees'

claims of immunity under Ohio's Political Subdivision Tort Liability Act.

5:03 CV 1002                                   60

*Constitutionality of Ohio's Political Subdivision Liability Act:*

Plaintiff's counter that this court should follow the *dicta* from *Butler v. Jordan*, 92 Ohio St.3d 354, 750 N.E.2d 554 (2001), to the effect that Chapter 2744 violates the state constitution.[19]

Again, he federal court in exercising supplemental jurisdiction must predict how the state court would decide a case "based on 'all relevant data' including such dicta."  *Chandler*, 283 F.3d at 824; *Garden City Osteopathic Hosp. v. HBE Corp.*, 55 F.3d 1126, 1130 (6th Cir. 1995). All relevant data, though, also includes lower state court rulings.  *Chandler*, at 824. The lower state courts have found the *dicta* from *Butler* that Chapter 2744 is unconstitutional to be neither binding nor persuasive.  State court decisions have: pointed out that legislative enactments enjoy a presumption of validity and constitutionality( *Adamsky v. Buckeye Local School Dist.*, 73 Ohio St.3d 360, 361, 653 N.E.2d 212 (1995)); that only three justices agreed in *Butler*'s plurality decision that Chapter 2744 violates Article I Section 16 of the Ohio Constitution, as applying only to the "state" and not its "political subdivisions;" noted that the state supreme court had held that Article I Section 16 granted the General Assembly constitutional authority to pass

_____

[19] This constitutional challenge triggers inquiry on the need to comply with Ohio Rev. Code §2721.12(A), the state declaratory judgment statute.  In *Cicco v. Stockmaster*, 89 Ohio St.3d. 95, 728 N.E.2d 1006 (2000), Ohio's Supreme Court found that a state trial court lacked jurisdiction under the former version of this declaratory judgement statute to consider the constitutionality of a statute on motion for summary judgement without a prior  presentation of  the issue in the complaint or amended complaint and without notifying the Ohio Attorney General of the constitutional challenge as required under this statute.  *Id.*, 89 Ohio St. 3d at 95, 728 N.E.2d at 1067 (syllabus). Whether plaintiffs are required to amend in order to assert their constitutional challenge would require examination of whether the state law is substantive, which a federal court must apply,  in exercising its diversity or supplemental jurisdiction, or whether it  is simply a matter of procedure, which federal law governs under the *Erie*-doctrine.  See *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188(1938). Federal district court decisions have brushed aside the state requirement as a "procedural" matter. See *Bell v. Marinko*, 235 F. Supp.2d 772, 780 (N.D. Ohio 2002); *Kammeyer v. City of Sharonville*, 311 F. Supp.2d 653, 661-62 (S.D. Ohio 2003). Hence no amendment of the complaint to include a declaratory judgment claim will be necessary.

legislation granting  immunity to political subdivisions; and noted that among them no state

appellate court has followed the plurality's *dicta*. See *Bundy v. Five Rivers Metroparks*, 152

Ohio App. 3d 426, 787 N.E.2d 1279 (2nd  Dist. 2003); *Thompson v. Bagley*, 2005 WL 940872

(Ohio App. 3d Dist. Apr 25, 2005); *Ratcliff v. Darby*, 2002 WL 31721942 (Ohio App. 4th  Dist.

Dec. 2, 2002); *Eischen v. Stark Cty. Bd. of Comm'rs*., 2002 WL 31831395 (Ohio App. 5th  Dist.

Dec. 16, 2002); *Walker v. Jefferson Cty*. 2003 WL 21505472 (Ohio App. 7th Dist. Jun 25, 2003);

*Shadoan v. Summit Cty. Children Services Bd.*, 2003 WL 22438893 (Ohio App. 9th Dist. Jan. 16,

2002); *Spencer v. Lakeview School Dist*., 2004 WL 2803302 (Ohio App. 11th Dist. Sep. 30,

2004). Accordingly this court disagrees with the position expressed in *Kammeye*r, 311 F. Supp.

2d 653, 661-63 (S.D. Ohio 2003) and *Owensby v. City of Cincinnati*, 385 F. Supp. 2d 626, 629-

30 (S.D. Ohio 2004), to adhere to *Butler*'s *dicta* that Chapter 2744 is unconstitutional, as the best

prediction of how the Ohio Supreme Court will address this issue based on "all relevant data"

including *dicta*  when directly confronted, especially considering that the *dicta* is a minority

position*.  See Ellis ex rel. Pendergrass v. Cleveland Mun. School Dist.*, 455 F.3d 690, 697-98

(6th Cir. 2006).

Plaintiffs' allegations do not establish clear and convincing evidence of negligence in

order to make the press release defamation without regard to the statutory immunity.

5:03 CV 1002                                      62


## CONCLUSION

For the foregoing reasons the defendants' motion for summary judgment is granted,

judgment is entered for defendants and the case is dismissed.

                                        _____
                                              s/James S. Gallas
                                        United States Magistrate Judge


Dated: May 25, 2007